Chatfield et al. *v.* Board of Revision of Taxes.

Argued November 25, 1942. Before Schaffer, C. J.; Maxey, Drew, Linn, Stern, Patterson and Parker, JJ.

*Robert T. McCracken*, with him *C. Brewster Rhoads*, for appellant No. 197.

*Joseph H. Lieberman*, with him *Michael D. Hayes*, Assistant City Solicitors, with him *Ernest Lowengrund*, Acting City Solicitor, for appellant No. 198.

*Henry S. Drinker*, with him *Thomas Stokes*, for appellees.

Opinion by Mr. Justice Drew, January 4, 1943:

"Stonehurst", a country estate of 50.6 acres, with a large mansion house and the usual outbuildings, situate at 7700 Cherokee Street, in Chestnut Hill, 22nd Ward, Philadelphia, was the home of Mrs. Sallie H. Henry for many years prior to her death on June 6, 1938. She was a daughter of Henry H. Houston, and had a life estate in this property under his will, with remainder in fee to her children, the present owners. On one side of "Stonehurst" is the home of her sister, 36 acres, and on another

side the home of her brother, 60 acres. And in the immediate vicinity, is Chestnut Hill Academy, 22 acres. All this property, a part of a much larger acreage owned by Mr. Houston, was distributed by his will to his children and grandchildren. His Estate sold the Academy property December 22, 1940. It is conceded that Chestnut Hill is "the highest residential neighborhood in the City of Philadelphia."

"Stonehurst" was assessed for taxation for the year 1941 at $440,000. After Mrs. Henry's death the mansion house and nearly all other buildings erected thereon were removed. The owners appealed to the Board of Revision of Taxes which refused to reduce the 1941 assessment. They thereupon made an appeal to the court of common pleas, and that tribunal, after a hearing, entered an order reducing the assessment to the sum of $201,000. Following the dismissal of their exceptions, the School District of Philadelphia and the City of Philadelphia took these appeals.

Appellants contend there is no competent testimony to support the action of the learned court below in reducing the assessment, and that in any event the action of the court is against the clear weight of the evidence. It is well settled in this Commonwealth that in this type of case the weight of the evidence is before this Court: *Westbury Apartments, Inc., Appeal,* 314 Pa. 130; *Rockhill I. & C. Co. v. Fulton County,* 204 Pa. 44; *Jursics' Appeal,* 149 Pa. Superior Ct. 523. However, the findings of fact of the court below have great weight, and we will not set them aside unless, of course, clear error is made to appear: *American Academy of Music Appeal,* 321 Pa. 433.

In *Westbury Apartments, Inc., Appeal,* supra, we said (p. 131): "The record of the assessment, made by proper officers, approved by the board of revision, is prima facie evidence on appeal to the court below of the value of the property; it will be conclusive unless the evidence to rebut it establishes to the satisfaction of the

court a different value." To meet the burden thus cast upon them by the introduction of the record of assessment, which showed that this land was assessed from 1924 to 1941 in the sum of $440,000, the owners called two real estate experts, and it is upon their testimony that the court below relied to warrant the reduction of the assessment by almost 60 percent. One of these experts, Emlen, testified that in his opinion the fair market value of the property in question as of the fall of 1940 was $201,000, and stated further, over the objection of counsel for appellants, that he arrived at such value in the following manner: "I realize that to sell the tract as a whole for its old purpose, that of a country estate, is impossible, or so unlikely that it would never pay the owners to wait for such a sale, and the alternative is to make a land development; 50 acres of ground in such a position as this should make a good land development of a higher grade. Now, I have studied a plan made by Wallace and Warner, who are experts in planning such developments, and by the aid of that plan I valued 25½ acres of land which is comparatively easily built upon and sold at $5,000 an acre, and 24½ acres of the steep ground and that which would not cut up easily I valued at $3,000 an acre, making $127,500 for the first part, and $73,500 for the second, totalling $201,000. That was taking into consideration all the awkward-shaped lots, those which have points which are hard to sell, those which are extremely deep with a limited amount of frontage for their depth, and those which are very steep in contour and hard to build on—unpopular kinds of lots . . . I figured the probable cost of roads to make the lots that I spoke of available, to be about $100,000. I figured that a developer or builder would take probably 5 years to get through with this job, and I allowed interest at 3 per cent., amounting to $30,000, to cover that item. Even though the taxes were cut in half, it would cost about $30,000 more over a period of 5 years in taxes. The total of the items, then, would have come to $201,000,

as I gave originally—present condition of the ground, $30,000 for interest, $30,000 for taxes, and $100,000 for improvements. Now, as to the $100,000 figure, it is impossible for anyone to be very accurate in that because you might put in extensive improvements, and the City might insist on your putting in expensive improvements, so that the figure has to be variable. Maybe the City will allow you to get away with more country road type, but there is a tremendous expense involved in grading to put roads through this tract, and therefore the total would amount to $361,000, which is at a final cost approximately $7200 per acre. . . ." This testimony should not have been admitted nor considered by the court below, for it is clearly too speculative and fanciful. It is not the proper method of arriving at the market value of the whole tract. As to the proof required, we said in a leading case, *Penn. S. V. R. Co. v. Cleary*, 125 Pa. 442, at 451: "It is proper to consider for what purpose it [the property] may be used to advantage, in order to determine for what price it will sell. It may be salable as a site for the erection of a hotel, a factory, a dwelling or a wharf, but it is not proper to lay . . . proof of what the hotel or other structure would cost, together with proof of the value of the lot with such structure upon it, and treat the difference between these sums as the value of the lot. Such a method would be speculative and fanciful. Equally improper is evidence showing how many building lots the tract under consideration could be divided into, and what such lots would be worth separately. It is proper to inquire what the tract is worth, having in view the purposes for which it is best adapted, but it is the tract, and not the lots into which it might be divided, that is to be valued . . ." See also: *Laureldale Cem. Co. v. Reading Co.*, 303 Pa. 315; *McSorley v. Avalon Boro. School Dist.*, 291 Pa. 252; *Hall v. Delaware, L. & W. R. R. Co.*, 262 Pa. 292. In this connection, it was also said by this Court, in *Watson v. The Pittsburgh and Connellsville Railroad*

*Co.,* 37 Pa. 469, 481: "They proposed to submit to the jury the conjecture of the witnesses as to what the plaintiff's lands would be worth, or what their market value would be at some unknown future time, when the railroad shall have been constructed. Such testimony does not rise even to the standard of an opinion. It is a mere guess, with no substantial foundation upon which to rest . . . An estimate of what property will be worth at a future day, or in an altered condition, is entirely without guide or measure, and must be wholly fanciful." See also: *Rothenberger v. Reading City,* 296 Pa. 423; *Kleppner v. Pgh., B. & L. E. R. R. Co.,* 247 Pa. 605.

The admission and the consideration by the court below of the testimony of the other expert, Priestman, called by the owners, was equally improper. This witness, when asked how he arrived at his valuation of $200,000, said: "Well, I happened to be instrumental in making a study in development of this property in conjunction with Wallace and Warner. We employed them, at least the Henry family employed them and I worked with Wallace and Warner to layout a number of lots. Then we took these lots and presupposed building certain houses on them, and we figured from experience and other sales what we could get from those houses. Then we deducted the price of the house from the total sale price and we got it down to a front foot value for the land. And that checked up with a number of other sales that I knew about and a number of other sales of houses. So that I took every single lot, 49 of them, and I appraised every single lot, and I got a full retail price of the property after all improvements were put in, which came to about twice my present appraisal. But the cost of putting those improvements there would be approximately $200,000, so I take the full retail price finished at $400,000 and I deducted $200,000 from it, and it brings me down to $200,000 . . ."

While both of the experts called by the owners stated that they had taken into consideration sales made in

other parts of Chestnut Hill, it is obvious from a reading of their testimony that they relied solely for their opinion as to value upon what the owners could ultimately realize for it with time and opportunity given to develop and sell the tract out in lots. Their testimony was clearly incompetent and the motions to strike it out should have been granted.

As against such testimony was that of the assessor for the district, called by the owners, wherein he stated that he personally had valued the property in question for the sum of $516,000 for the year 1941, and although this figure was later cut by the Board of Revision to $440,000—in order that it might conform to the previous assessments in that amount which had been made on the property continuously since 1924—he was of the opinion that at the sum of $440,000 the property was under-assessed. Also, there is the testimony of the expert, Kidd, called by appellants, who stated that in his opinion the property was valued at $450,000, and further stated that in arriving at this sum he had taken into consideration the sale in 1940 of a large tract of similar land in the immediate vicinity by the Houston Estate to the Chestnut Hill Academy and other sales, the names of which he gave.

The findings of fact and conclusions of the court below must be set aside for obviously they are based on the incompetent testimony of the owners' experts. That the learned court relied upon such testimony is made evident by the following excerpt from its adjudication: "No such case as this can be decided by precise formula. The ultimate basis for decision can be only the opinion of those who are considered expert from having dealt for years in real estate and who know general or particular facts about the property and the neighborhood. Some knowledge of current social and economic conditions is also helpful. Appellants' two experts are of the opinion that this property could not be sold at all unless it were broken up and 'developed.' They approach the

problem in terms of use, and it appears from their testimony that they have arrived at their valuation of $200,000 on the basis of best possible use, namely, as what they call a land development: this means running roads through the property, installing sewer, light and power services, grading, and dividing the tract into smaller units for sale and building. In this I think they have the common sense of it . . ." The court further stated: "It is my opinion that appellants have presented a reasonably intelligent and workable basis of value, founded on use in the light of conditions as they are. This carries the burden against the assessment, which I regard as being founded on factors which are out of line with reality and do not disclose actual market value." And the court stated during the course of the trial: "I think we have to take each case on the hoof as we find it. The witness has explained that this is a large tract of ground located in this part of the town, where, in his opinion, it would be impossible to sell it as a lump and would have to be sold piecemeal. I think anybody who knows real estate markets today would agree that that is a reasonable point of view, and if the rules don't provide for that, then we simply will have to bend the rules so they will."

This case was improperly tried. The expert testimony of the witnesses for the owners, being incompetent, should not have been admitted, and having been received, should have been stricken out on motion. The only competent testimony on the owners' side regarding market value was given by the assessor, Terry. He produced the assessment rolls, testified to his assessment of the property for 1941, which he said was revised to $440,000 by the Board of Revision of Taxes, and that the revised figure was, in his opinion, an under-assessment. The production of the assessment rolls established a prima facie case in favor of the City, although the witness was called by the owners, and the fairness of the valuation must be assumed. In the absence of competent

testimony to show its incorrectness, or that the action of the board was arbitrary, and in disregard of the owners' rights, it is conclusive: *Penna. Co. for Ins. on L. & G. Annuities, Appeal,* 282 Pa. 69. There is nothing in the case to show the action of the board was arbitrary or unfair, and therefore the assessment is final. But even if such were not so, the City produced competent testimony to show market value, and in such degree that it must be said that the action of the court below in reducing the assessment was contrary to the great weight of the competent testimony.

The final decree of the learned court below is reversed, the assessment of $440,000 made by the Board of Revision of Taxes for the year 1941 for premises numbered 7700 Cherokee Street, 22nd Ward, Philadelphia, otherwise known as "Stonehurst", is restored and affirmed; costs to be paid by owners.