Sgarlat Estate *v.* Commonwealth.

Argued November 17, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

reargument refused March 17, 1960.

*Neville B. Shea,* for appellants.

*Morris J. Dean,* Deputy Attorney General, with him *Jacob Schiffman, Thomas F. Gill,* and *Anne X. Alpern,* Attorney General, for appellee.

OPINION BY MR. JUSTICE BOK, January 18, 1960:

The case involves the price to be paid by the Commonwealth for condemning part of plaintiff appellant's land.

The Sgarlat family has been in the sand and gravel business in Luzerne County for many years, and in 1932 acquired a tract of land in the Borough of West Wyoming consisting of 33.8 acres. They also have a washing plant a few miles away, at Forty Fort, where sand and gravel from the West Wyoming land is washed and made commercial. The product is of high quality and is in active demand in the area. It appears throughout the West Wyoming tract from surface level to a depth of thirty-five feet or more, and the Sgarlats have been excavating it since 1946.

On September 14, 1955, the Water and Power Resources Board, having entered appellant's land on Au-

gust 27, 1954, adopted a resolution of condemnation under the basic Act of 1936, First Ex. Sess., August 7, P. L. 106, 32 P.S. §653 et seq., which gave the Board the power of eminent domain.

The land so condemned consisted of three separate bits of the West Wyoming tract: Parcel 23WW-s, 2.826 acres; Parcel 23WW-2C, 1.222 acres; and Parcel 23WW-2F, 0.78 acres; a total of 4.828 acres. The third parcel cannot be excavated, since it is so small that it owes full support to its neighboring owners, and hence it does not concern us. The Board constructed levees on all three parcels as part of the Flood Control program.

The Board's appraisers valued the condemned acreage at $1660, which was offered and refused, and a Board of View later awarded $6500. Plaintiff appealed to the Court of Common Pleas, which on trial directed a verdict for the defendant Commonwealth.

This left the record in the odd state of providing no compensation for the taking of appellant's land. The explanation lies in appellant's theory of the case, which was that the property had no market value but was intrinsically worth $382,000 before the taking and $90,000 after. This brace of figures stems from considering the sand and gravel apart from the land, considering the West Wyoming and Forty Fort lands as an inseparable business unit, considering future profits or royalty values, considering the value of the sand and gravel needed to be left in place in order to support the levees, and considering the lack of comparable sales and the uniqueness of the situation. Both counsel stated that they had no testimony of fair market value to submit to the jury. The Court's measure of damage was, according to its considered expression after argument en banc: "The market value of the entire tract before and after the taking, giving effect to the taking

and also taking into consideration in fixing the value that there is a deposit of sand and gravel on the land . . . the price which a purchaser willing but not obliged to buy would pay an owner willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied (Vollmer v. Philadelphia, 350 Pa. 223, 228)." See *Ward v. Commonwealth,* 390 Pa. 526 (1957), 136 A. 2d 309. This resulted in the directed verdict.

The Commonwealth, properly recognizing that it may not constitutionally take land without the just compensation required by Article I, Section 10, of the State Constitution, has agreed that however this appeal is decided it will pay at least the $6500 set by the Board of View.

The court below was right. Commonwealth does not condemn an owner's business acumen or its results expressed in value. It condemns his property, which one man may use exceeding well, another ill, and a third not at all. The use of one's talents is a private, not a public matter. If we own part of the common earth, we risk having to return it to the common use, and what we may expect to get for it in compensation is the common value. We so admire industry and ingenuity that the obverse of the appellant's picture is easier to see fairly. If his fields contained diamonds and he never raised his hand to take them, he could not expect to be compensated after condemnation for all of his estimated diamonds at Tiffany prices. No more should the owner expect it who does make ado to realize them and sell them: he has done so while he owned them, but when the public needs his land for the general good, he may not hope to be paid thereafter for what he may no longer realize. All he can get is the value of his land as affected by an idea that may appeal to the general or average buyer.

This has always been the policy of our law. In *Searle v. Lackawanna & Bloomsburg Railroad Co.,* 33 Pa. 57 (1859), Chief Justice LOWRIE said: "Land may have $4000 worth of coal per acre in it, and yet sell at $40 per acre.

"When a man has to sell his property, of course he must take the market value for it. That is measured by the custom or common dealing of the country. If it is land, the market value is measured by the price usually given for such land in that neighbourhood, making due allowance for differences of position, soil, and improvement. Value may be very approximately estimated in that way, for it is not then founded upon the mere opinion of witnesses, but on the fact of a general market value.

"When the state takes private property for public uses, or authorizes it to be taken, this market value is all that it pays for it. This is the necessary measure, in order to avoid the favouritism or oppression that would attend any other measure. Every man holds his property subject to this eminent domain, dominion, or ownership of the whole society. He must give it up when society needs it, on being paid its value according to the estimate put on it in the market, that is, by common consent."

This rule has been followed in *Reading & Pottsville Railroad Co. v. Balthaser,* 119 Pa. 472 (1888), 13 A. 294; *Appeal of Henry Fulmer,* 128 Pa. 24 (1889), 18 A. 493; *Cole v. Ellwood Power Co.,* 216 Pa. 283 (1907), 65 A. 678. In *Cole* a distinction was made to allow for the taking of a mineral deposit apart from the land: such a case is *Lehigh Coal Co. v. Wilkes-Barre & Eastern Railroad Co.,* 187 Pa. 145 (1898), 41 A. 37, where the *condamnum* was a culm bank already mined and piled on the land. It was held to be personalty. But in *Balthaser* Mr. Justice GREEN said: "The value of

the plaintiff's land as limestone land was a proper subject of consideration . . . in estimating the damages, but not the value of the stone under the road." See also *Becker v. Philadelphia & Reading Railroad Co.,* 177 Pa. 252 (1896), 35 A. 617.

Appellant seeks to treat his two properties as one, citing *Cameron v. Pittsburgh & Lake Erie Railroad,* 157 Pa. 617 (1893), 27 A. 668, and *Morris v. Commonwealth,* 367 Pa. 410 (1951), 80 A. 2d 762. These cases involved farm land through which ran, respectively, a canal and a road, and the properties obviously formed a unit that was damaged as a whole. *Contra* can be cited *Pennsylvania Co. v. Pennsylvania Schuylkill Valley Railroad Co.,* 151 Pa. 334 (1892), 25 A. 107, and *Potts v. Pennsylvania Schuylkill Valley Railroad Co.,* 119 Pa. 278 (1888), 13 A. 291, where the properties were separated, respectively, by an intervening tract and by a mile or more of distance: these separated bits were held not to form a unit. In the case before us the separation is by three miles or more, and the Forty Fort bit, where the washery is, could be used for other purposes than washing sand and gravel from the West Wyoming tract. The two parcels may form a business unit for the moment, but either could, with some adjustment, go on functioning without the other, and appellant's primary thrust is more at business damage than at land damage.

Nor may he measure his harm by loss of anticipated profits. In *Johnson's Petition,* 344 Pa. 5 (1942), 23 A. 2d 880, we quoted from *Iron City Auto Co. v. Pittsburgh,* 253 Pa. 478 (1916), 98 A. 679, where Mr. Justive VON MOSCHZISKER gathered all of the pertinent precedents and said: "Under no circumstances can 'profits of business' be claimed in condemnation proceedings."

Counsel for appellant said during the trial: ". . . we cannot show the actual profits in the past that have been made by the Sgarlats out of the West Wyoming tract." Hence our view is limited to future profits, which have always been held conjectural and speculative. In *Laureldale Cemetery Co. v. Reading Co.*, 303 Pa. 315 (1931), 154 A. 372, Mr. Justice MAXEY said, in a case involving a cemetery where there was no evidence of comparable sales: "Every owner of acreage which is likely to be appropriated under eminent domain will be tempted to designate his land as an airport, a public golf course, an amusement park, a fox farm or a peach orchard, or something else distinctive, and by so using a portion of it give all of it the status claimed. Future values of the entire tract based on anticipated profits would be conjectured, and the present worth of this future value would become the measure of damages for any of the land taken. . . . ."

In *Chatfield v. Board of Revision of Taxes*, 346 Pa. 159 (1943), 29 A. 2d 685, we refused to base damage value upon the future development of a large estate as a community of small homes, and in *Cox v. H. & P. Railroad Co.*, 215 Pa. 506 (1906), 64 A. 729, we allowed the plaintiff to show that his land could be used for raising ducks but not the number of ducks or the profit from them.

We are told that there are no comparable sales, but this does not preclude a show of value. In *Philadelphia & Reading Coal & Iron Co. v. Commissioners of Northumberland County*, 323 Pa. 185 (1936), 186 A. 105, we held that where there are no recent sales or active market for the kind of property involved, other elements may be considered. These are well set out in *Philadelphia & Reading Coal & Iron Co. v. Commissioners of Northumberland County*, 229 Pa. 460 (1911), 79 A. 109: "If, however, there were no sales from which

the general selling price might be ascertained, the market value may be established by the testimony of persons acquainted with the property, and whose knowledge and experience qualify them to form an intelligent judgment as to its proper valuation. In such cases it is proper to adduce evidence upon all matters affecting probable selling price, such as location, condition, improvements, quality of land or coal, and any other element of value that would influence the mind of a purchaser: Pittsburg, etc., R.R. Co. v. Patterson, 107 Pa. 461; Pittsburg, etc., Ry. Co. v. Vance, 115 Pa. 325."

The point is that various elements may be mentioned as themselves affecting value, but without giving their specific value in terms of money. Thus, in *Butler Water Company's Petition,* 338 Pa. 282 (1940), 13 A. 2d 72, we refused to allow the cost of removing facilities as a separate item of damage but allowed the fact to be taken into account in fixing general value: *Becker v. Philadelphia & Reading Railroad Co.,* supra (177 Pa. 252) ; *Philadelphia Ball Club v. Philadelphia,* 192 Pa. 632 (1899), 44 A. 265. In *Chambers v. South Chester Borough,* 140 Pa. 510 (1891), 21 A. 409, we said: "Attempts have often been made to introduce particular items of damage . . . such as the cost of fencing, loss of business, expense of altering buildings, the value of minerals under the surface, and many other distinct and independent matters . . . but we have repudiated them all."

In *Westinghouse Air Brake Co. v. Pittsburgh,* 316 Pa. 372 (1934), 176 A. 13, we said: "Estimates as to the costs of rebuilding specific items of property or injury to particular uses affected by the taking, are not recoverable or admissible as distinct items of damage, but such losses may become useful as elements bearing on the market value before and after the appropriation."

It is the fact of such loss, not its actual statement in dollars that is the permissible element affecting damage. It has been suggested that the royalty value of the ascertained amount of sand and gravel in the ground would provide a ready measure of damage. We disagree, because royalty value is another facet of profits and business accounting.

Finally, it is urged that the owner is competent to testify to the value of his property. In general he is competent, since he has at least a general knowledge of what he owns: *Hencken v. Bethlehem Water Authority*, 364 Pa. 408 (1950), 72 A. 2d 264. But he is subject to the current rules and occupies no special position as a witness. Appellant is in the position of the witness whose testimony was held incompetent in *White v. Pennsylvania Railroad Co.*, 229 Pa. 480 (1911) 78 A. 1035, where we said: ". . . Not only did he repeatedly admit in his preliminary examination that he had no familiarity with the market value of the land in the neighborhood, but when testifying in chief he as repeatedly said that the estimate he gave was not a market value, but a value based on what he thought the farm would produce. When asked how he arrived at the market value, his reply was that he did not believe it right to consider market value; that he had his own notion as to what this land was worth, and was not governed by outside sales; that he estimated it from its earnings capacity, and that he could not confine himself in his estimate to market value. Thus the one standard by which the law measures damages in cases of this kind was distinctly repudiated by the witness. . . ."

The record, in fact, is not barren of effective evidence. Certainly there is no clear evidence that the property has no market value. There is a thick and continuous blanket of sand and gravel under the Wyo-

ming Valley. The witness Banks spoke of a sale of sand and gravel land in the Valley: his company bought its tract of "stone" property. In thirty years this witness operated three sand and gravel enterprises in Luzerne County, and he mentioned one other concern in the business in 1955 besides himself and appellant. Even appellant named two outside the Valley but within a radius of ten miles, and two others in the Valley. He also said that his company has bought another piece of land two miles from the property in suit. There is evidence of some eighty holes bored on the acreage to determine the extent of paydirt. Altogether there seems to us ample evidence, even if there is little by way of comparable sales, from which a fact-finder advised by the "custom or common dealing of the country" could establish what value such land has among its neighbors and according to the rules. The figure of the Board of View, $6500, should be adopted as the value, in accordance with the agreement of the parties.

Our view of the case renders irrelevant appellant's subsidiary claims for support and loss of water rights.

The judgment is affirmed.

Mr. Justice McBride took no part in the consideration or decision of this case.