## Gilleland *v.* New York State Natural Gas Corporation, Appellant.

Argued October 8, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*E. P. Herrington, Jr.*, with him *Fred B. Trescher*, and *Kunkle and Trescher*, for appellant.

*H. E. Shaw*, with him *Scales and Shaw*, for appellees.

OPINION BY MR. JUSTICE BOK, April 18, 1960:

Defendant has appealed a judgment of $9200 for plaintiffs in a condemnation case involving the placing of a transmission gas pipe.

The core question is whether it was speculative, under the evidence, to let the jury consider that the best use of plaintiffs' land was for the development of community lots. We think that it was.

The main conflict in the testimony had to do with the value of the land before and after the taking. Plaintiffs and their five witnesses ranged between $9000 to $19,000 for the difference in market value before and after; defendant's two witnesses from $1500 to $1800. The Board of View awarded $9000.

The essential facts, not disputed, are that plaintiffs own twenty-nine acres, generally bisected by a driveway servicing their home and outbuildings. While this road does not traverse the entire lot, it conveniently divides it into a northerly portion of 16.3 acres and a southerly portion of 12.7 acres. Raymond Gilleland is a dentist and uses the property as his residence.

The defendant, acting under the Act of May 29, 1885, P. L. 29, §10, 15 PS §§1989 and 2031, condemned a right of way and installed a gas pipe of twelve inches' inner diameter and 12¾ inches' outer diameter and made of seamless steel electrically welded. It was buried thirty inches below the surface. This pipe's designed load is 1235 pounds per square inch but it could withstand a bit over 2000 pounds. An actual load of 174 pounds has been put on it and defendant does not contemplate ever using over 500 pounds. A domestic gas line uses between two and eight ounces.

The pipe in question enters plaintiffs' property at its northwest corner and travels parallel to the northern boundary, and twenty-five feet from it, for a distance of 1464 feet. It then alters course toward the southeast and leaves the property at a point 119 feet from the northeast corner. The entire right of way is 1802 feet long, and at trial a width of 35 feet was stipulated. The residence is 500 feet distant from the pipe.

Evidence was given for the plaintiffs that the southern edge of a real estate development known as Lincoln Heights was 1000 feet north of plaintiffs' northern boundary. This development was laid out in 1922 but was not actually begun until 1946, when seventy lots were sold out of two hundred and six. Twenty-seven now remain unsold. Several witnesses testified that the highest and best use of plaintiffs' land was its development for home sites. No evidence was offered of the cost of lots or building or the usual concomitants of development.

The Act of 1885 fixes no measure of damages, and hence we are governed only by the constitutional requirement of just compensation for property taken, injured, or destroyed: *Fisher v. Baden Gas Co.*, 138 Pa. 301 (1890), 22 A. 29.

The general rule is that what must be assessed is the market value of the property as affected by the taking. This is done by determining the market value of the property as a whole immediately before the taking and unaffected by it and the market value immediately after the taking and affected by it: *Johnson's Petition,* 344 Pa. 5 (1942), 23 A. 2d 880; *Dyer v. Commonwealth,* 396 Pa. 524 (1959), 152 A. 2d 760.

In the ascertainment of market value expert opinion evidence is customary though not exclusive. As we said in *Westinghouse Air Brake Co. v. Pittsburgh,* 316 Pa. 372 (1934), 176 A. 13: "Market value or damages may be established by the owner of the property, by expert witnesses, or by persons with knowledge and experience qualifying them to form a reasonably intelligent judgment as to value." Comparable neighborhood sales are conventional evidence, but other factors may be used when there are no sales: *Philadelphia & Reading Coal & Iron Co. v. Commissioners of Northumberland County,* 323 Pa. 185 (1936), 186 A. 105; 229 Pa. 460 (1911), 79 A. 109.

Particular items of damage may be considered as facts, but their specific value may not be given, such as the cost of replacement or of fencing or of rebuilding or of removal or of alterations, or the value of subsurface minerals: *Graham & Co. v. Pennsylvania Turnpike Commission*, 347 Pa. 622 (1943), 33 A. 2d 22; *Butler Water Co.'s Petition*, 338 Pa. 282 (1940), 13 A. 2d 72; *Chambers v. South Borough of Chester*, 140 Pa. 510 (1891), 21 A. 409; *Westinghouse Air Brake Co. v. Pittsburgh*, supra (316 Pa. 372); *Reading & Pottsville Railroad Co. v. Balthaser*, 119 Pa. 472 (1888), 13 A. 294. Profits from business or anticipated profits are conjectural and have no place in present market value: *Iron City Auto Co. v. Pittsburgh*, 253 Pa. 478 (1916), 98 A. 679; *Laureldale Cemetery Co. v. Reading Co.*, 303 Pa. 315 (1931), 154 A. 372; *Sgarlat Estate v. Commonwealth*, 398 Pa. 406 (1960), 158 A. 2d 541.

Appellants were entitled to show the highest and best use of their land, provided they establish it by competent evidence. In *Erie City v. Public Service Commission*, 278 Pa. 512 (1924), 123 A. 471, we said: "The landowner, in a condemnation proceeding, is not limited to any one use, but is entitled to have the land considered for any and all uses. He may show that it is specially valuable for a certain, particular purpose, and that purpose may enter into the value before the jury: Cox v. P., H. & P. R. R. Co., 215 Pa. 506."

Lots are not to be rated as speculative merely because they are lots. The basic rule appears in *Pennsylvania Schuylkill Valley Railroad Co. v. Cleary*, 125 Pa. 442 (1889), 17 A. 468, where we said: "The jury are to value the tract of land, and that only. They are not to determine how it could best be divided into building lots, nor conjecture how fast they could be sold, nor at what price per lot. A speculator or investor in deciding what price he could afford to pay, would consider the chances and probabilities of the

situation as then actually existing. A jury should do the same thing. They are not to inquire what a speculator might be able to realize out of a resale in the future, but what a present purchaser would be willing to pay for it in the condition it is now in. . . ."

Following this rule we decided *Chatfield v. Board of Revision of Taxes,* 346 Pa. 159 (1943), 29 A. 2d 685, citing *Cleary* and refusing to base damage upon the cost of a possible future development of a large estate as a community of small homes. In *Rothenberger v. Reading City,* 296 Pa. 423 (1929), 146 A. 104, we approved the lower court's rejection of a recorded plan showing the subdivision of the subject land into lots. We said: ". . . the jury [was] told that in assessing the damages all market value-giving elements must be taken into account, and in deciding this question all chances and probabilities of using the property for bungalow sites, or otherwise, must be weighed, including the possibility that it might be divided into lots, though in arriving at a verdict, it could not base its calculation on the number into which the land could be divided, and the separate value of all taken, thus reaching an aggregate amount, as determining the loss sustained. The owners have no reason to complain of the instructions given . . ." .

In *Stone v. Delaware, Lackawanna & Western R. R. Co.,* 257 Pa. 456 (1917), 101 A. 813, we said: "The instruction . . . is not open to defendant's objection that the jury was permitted to find speculative damages. Plaintiff's land was suburban property and, as stated in the charge, a number of similar tracts in the neighborhood had been recently plotted and sold as building lots. The possibility of utilizing the land in question for this purpose was not therefore merely remote and speculative, but a legitimate prospect for consideration by the witnesses and the jury in forming their opinion as to its present value."

In the instant case the evidence of the vitality of a future development of the area came from the testimony of several witnesses. The plaintiff owners had nothing to say on the subject. A neighbor said: "Well, I know it is *in Dr. Gilleland's mind,* he talked to me about it." Zannarini, who owns the 37 acres between the plaintiffs and the Lincoln Heights development and who once owned the Gilleland's place and lived there for nine years, has known the property for thirty years. The best he could say of his own land was: "Our experience with developing has been limited, have plan for sale of lots . . . we have had a considerable amount of offers, at least every three or four months *in the past seven or eight years or longer.*" Martin, who developed Lincoln Heights, speaking of 1954, a year before condemnation, said: "I was called there by Dr. Gilleland the prior summer and we walked over the entire property with the idea of determining whether it would . . . be a good development site for home sites *after the Zannarini property had been developed* . . . Mr. Zannarini asked me to take over the development of his adjoining property and *even before we have laid it out in lots* I have had builders approach me and requested that I reserve blocks of lots for them *when the time comes.*" The most that was done on the Zannarini land, according to Martin, was "Preliminary survey made by same engineer that did our work."

This sums up the testimony on the point, and it is so vague and scanty that we do not hesitate to call it remote and speculative as a matter of law. A property owner may expect compensation for reasonable certainties inherent in the present, not for chances or future possibilities. The date of the taking remains the basic reference point.

Finally, while there is evidence of some interest, there is no real showing of actual demand or market for lots: see *Hall v. Delaware, Lackawanna & Western R.*

*R. Co.,* 262 Pa. 292 (1918), 105 A. 98; *Laureldale Cemetery Co. v. Reading Co.,* 303 Pa. 315 (1931), 154 A. 372; *Graham & Co. v. Pennsylvania Turnpike Commission,* 347 Pa. 622 (1943), 33 A. 2d 22. As we said in *Laureldale*: "Mere prospects have little pecuniary value."

Since the case must be tried again, we note in passing the horrors of leakage and explosion caused by accident or negligence, which are hinted at in the record, and invite the attention of counsel to such cases as *Shuster v. Central District & Printing Telegraph Co.,* 34 Pa. Superior Ct. 513 (1907), where a telephone line was laid across land and damage from possible bolts of lightning was held to be fanciful and was disallowed; or *Wallace v. Jefferson Gas Co.,* 147 Pa. 205 (1892), 23 A. 416, where a gas line was laid across coal nearly 200 feet beneath and the possibility of the land subsiding after mining and breaking the gas pipe, with dreadful results, was held remote and incompensable; or *Denniston v. Philadelphia Co.,* 161 Pa. 41 (1894), 28 A. 1007, where leakages in the gas line were sought to be ascribed to defendant's negligence, which was held to be speculative.

The judgment is reversed with a *venire facias de novo.*