Pennsylvania Gas and Water Company,
Appellant, v. Pennsylvania Turnpike
Commission.

Argued January 9, 1967. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused December 29, 1967.

*Joseph E. Gallagher*, with him *John W. Bour, Gomer W. Morgan, Carlon M. O'Malley, Charles E. Thomas,* and *O'Malley, Morgan, Bour & Gallagher,* and *Metzger, Haefner, Keefer, Thomas & Wood,* for appellant.

*John A. Morano,* Local Counsel, with him *Richard D. Holahan,* Chief Counsel, and *Henry E. Harner,* General Counsel, for appellee.

OPINION BY MR. JUSTICE ROBERTS, November 28, 1967:

The first question raised by this appeal is whether the plaintiff-appellant, the Pennsylvania Gas and Water Company, may show that the highest and best use for its condemned property is as a site for the construction of a reservoir, even though at the time of the condemnation no physical improvements had been made on the property. Finding as a matter of fact that the use of appellant's property as a reservoir was mere speculation and hence not provable as the highest and best use, see *Rothman v. Commonwealth*, 406 Pa. 376, 178 A. 2d 605 (1962) ; *Spring City Gas Light Co. v. Pennsylvania Schuylkill Valley R.R. Co.*, 167 Pa. 6, 31 Atl. 368 (1895), the trial judge rejected much of the proferred evidence by which appellant sought to show 1) that the property was physically suited for a reservoir site; 2) that the appellant was going to construct a reservoir thereon; and 3) that there was a great need in the community for additional water supply.

Following an award of $72,000 (based upon the valuation of appellant's land for recreational and residential purposes), both the water company and the Turnpike Commission filed exceptions, all of which were subsequently dismissed by the Court of Common Pleas of Lackawanna County.[1] Judgment was entered on the award as made by the trial judge, and this appeal followed.

Since before the turn of the century, appellant water company, and its predecessors in title, have owned several contiguous tracts of land totaling about 275 acres in South Abington Township, Lackawanna County. It is conceded by all concerned that this property

---

[1] The dismissal of the Turnpike Commission's exceptions was not appealed.

was acquired with an eye toward the eventual construction of a reservoir, although it has remained unimproved for over 50 years.[2] Nevertheless, the appellant's witnesses did testify that as a matter of sound industry practice water companies frequently hold potential reservoir sites for periods of time as long as this so that future water needs may be adequately met. This is especially true in the present case since the water company's property is naturally suitable for a reservoir site given the presence of several creeks which intersect on the lower portion of the tract.

On June 8, 1954, pursuant to the provisions of the Pennsylvania Turnpike Northeastern Extension Act of September 27, 1951, P. L. 1430, 36 P.S. §600.8(a), the Pennsylvania Turnpike Commission condemned 15 acres from the appellant's tract. The condemned portion was precisely that part of the tract needed for the erection of a dam, without which the reservoir could not be constructed. As a result, the tract, in its present condition, is useless for reservoir purposes.

It is well settled in Pennsylvania that condemnation damages need not be based upon the use currently being made of the condemnee's property if in fact its highest and best use is shown to be for some other, more valuable purpose.[3] *Gilleland v. New York State Natural Gas Corp.*, 399 Pa. 181, 159 A. 2d 673 (1960); *Erie City v. Public Service Comm.*, 278 Pa. 512, 123 Atl. 471 (1924); *Stone v. Delaware, Lackawanna & Western Railroad Co.*, 257 Pa. 456, 460, 101 Atl. 813,

---

[2] Appellant did however attempt unsuccessfully to introduce evidence that some plans had been prepared and that trees had been planted at the dam site to protect the watershed.

[3] The 1964 Eminent Domain Code, while not applicable to this case, since appellant's property was taken long before the effective date of the statute, also states quite clearly that market value may be based either on highest and best available use or present use. Act of June 22, 1964, P. L. 84, 26 P.S. §1-603 (Supp. 1966).

814 (1917); *Savings & Trust Co. of Indiana v. Pennsylvania Railroad Co.*, 229 Pa. 484, 488, 78 Atl. 1039, 1040 (1911). However, there is at least one substantial limitation on this principle. Even if a piece of land is *physically* suited for a particular purpose, it must also appear that such use is not based upon mere speculation. *Sgarlat Estate v. Commonwealth*, 398 Pa. 406, 158 A. 2d 541, cert. denied, 364 U.S. 817 (1960); *Laureldale Cemetery Co. v. Reading Co.*, 303 Pa. 315, 154 Atl. 372 (1931); *Marine Coal Co. v. Pittsburgh McKeesport & Youghiogheny Railroad Co.*, 246 Pa. 478, 485, 92 Atl. 688, 690 (1914).

The real problem here arises from the difficulties involved in ascertaining the precise meaning of the terms "speculative use" and "mere speculation." Both the lower court and the appellee have assumed that a use is speculative whenever the condemnee has made no physical change in his property pointing toward such a use. However, our case law indicates that such is not the rule. See *Gilleland, Erie City,* and *Stone,* supra. Nor is it true that to escape the label of "speculative," the condemnee must show that there are plans to convert the property to the desired use immediately or in the very near future. As this Court said in *North Shore Railroad Co. v. Pennsylvania Co.*, 251 Pa. 445, 449, 96 Atl. 990, 992 (1916): " 'The true rule is that any use for which the property is capable may be considered, and if the land has an adaptability for the purposes for which it is taken, the owner may have this considered in the estimate as well as any other use for which it is capable.' "

Moreover, in *Marine Coal,* supra, it was said at page 486, 92 Atl. at 690-91: " 'Clearly it [the condemned land] is of insignificant value for agricultural purposes, and there is neither a wharf, a factory, or a saw mill on it, and there may never be. But if its adaptability to these purposes or any one of them give

it a present value, the owner is entitled to that value, though in fact no one now proposes to use it for any of these purposes.' "

Finally, were it necessary for the condemnee to show that the land was actually being *used* for the purpose upon which he seeks to base condemnation damages, a suggestion frequently advanced below, there would be nothing left at all of the highest and best use principle; it would become merged with the current use.[4]

A careful study of cases involving the concept of speculative use reveals that the term is given a much more technical and restricted definition than that advanced below. Uses have been termed speculative, and hence not provable as the highest and best use, only in those instances where the condemnee sought a measure of damages that was in essence based on anticipated *profits* from a use not yet being made of the property. For example, in *Laureldale Cemetery Co. v. Reading Co.,* 303 Pa. 315, 154 Atl. 372 (1931), relied upon both by the appellee and the court below, the plaintiff cemetery company unsuccessfully tried to show that its condemned land was being held for use as burial plots and that the measure of damages should be based upon the profits plaintiff could have earned

---

[4] If the lower court's theory is carried to its logical conclusion, appellant could not even have its property valued as residental. since at the time of the condemnation no houses were constructed on the tract, nor were there any plans to subdivide it or construct homes in the future. On the issue of present use versus future use, it is important that we distinguish cases such as *Bitting v. Philadelphia Suburban Water Co.,* 73 Montg. Co. L. Rep. 235 (1956). Reliance upon this decision by the appellee is misplaced. That case does no more than stand for the proposition that a condemnee cannot claim as the highest and best use, any use for which his land is not physically *suited* at the time of condemnation. The case does not imply that only present use may be the controlling test.

from the sale of these plots.[5] This loss of profits meas-
ure is clearly distinguishable from the present case. In
*Laureldale* the unimproved lots, qua lots, were worth
no more simply because the plaintiff had the business
acumen needed to operate a cemetery thereon. How-
ever, appellant water company has never claimed that
its property should be valued on the basis of profits
made from the operation of a reservoir. Nor has it
claimed that its land should be valued as though a res-
ervoir already existed on the tract. Instead it claims
simply that the land itself is worth more than the
$72,000 awarded below because it is physically suitable
for a reservoir and because such a project is needed in
the area.

This second argument, viz., the need for a reservoir,
apparently underlies much of the confusion below re-
garding the speculative use problem. For even though
the valuation of appellant's property as a reservoir does
not fail on the basis of its being a speculative use,
nevertheless, in order to establish a reservoir as the
highest and best use, the water company must show
that a reservoir is needed in the area. *A. D. Graham
& Co., Inc. v. Pennsylvania Turnpike Comm.*, 347 Pa.
622, 33 A. 2d 22 (1943). On its face this hurdle may

---

[5] See also *Sgarlat Estate v. Commonwealth*, 398 Pa. 406, 158 A.
2d 541, cert. denied, 364 U.S. 817 (1960). Here the condemnee was
not permitted to show that the sand and gravel on his condemned
property could have been profitably marketed. Compare *Rothman
v. Commonwealth*, 406 Pa. 376, 178 A. 2d. 605 (1962) where plain-
tiff was permitted to introduce a rough preliminary plot plan in
order to show that the highest and best use of his property was
for a housing development, even though no such development had
been started, with *E. M. Kerstetter, Inc. v. Commonwealth*, 404
Pa. 168, 171 A. 2d 163 (1961), where a more detailed plan was ex-
cluded since its purpose was to show the difference in number of
lots before and after condemnation, and also because it, together
with condemnee's other proferred testimony, would have shown the
selling price for similar lots.

appear somewhat similar to the speculative use issue, insofar as both bear ultimately on the financial success or failure of the suggested venture. Procedurally, however, they are quite different. If in fact it is determined that the condemnee is trying to prove anticipated profits, the court may quite properly exclude such testimony. However, since the condemnee *must* show that some demand exists in the area for the use sought to be established, far from excluding testimony on this issue as was done below,[6] the court is under a duty to admit it. Clearly one owning a flat strip in Death Valley may show that the property is physically suited for a race track or a parking lot. But, without proof of need for such a structure *in that area,* it would be folly to hold that such is the highest and best use.

There are then two requirements, and only two, for proving highest and best use. First, the condemnee must show the physical adaptability of the land to such a use, and second it must be demonstrated that this use is needed in the area. This second test, however, does not require that the condemnee himself convert the land to its highest and best use. See, e.g., *Wadsworth v. Manufacturer's Water Co.,* 256 Pa. 106, 100 Atl. 577 (1917); *Brown v. Forest Water Co.,* 213 Pa. 440, 62 Atl. 1078 (1906); *Gearhart v. Clear Spring Water Co.,* 202 Pa. 292, 51 Atl. 891 (1902). Unlike the water company here, in each of these cases the original land owner never intended to construct a reservoir. In fact, were it not for the condemnation there would probably never have been a reservoir at that spot. Nevertheless, in each case the landowner was

---

[6] It should be noted that the rejected evidence concerned demand for a reservoir "since this condemnation in 1954" (record at 40a). While we will not speculate on the exact years with which the water company's testimony would have concerned itself if admitted, it is well established that demand must be shown as of the date of condemnation, in this case 1954.

permitted to show that the highest and best use for the property was as a reservoir site.[7] Of course, even if the need is present, if the land *at the time of the condemnation* is not yet physically suited for the claimed best use, the condemnee will not prevail. For example, in *Bitting v. Philadelphia Suburban Water Co.*, 73 Montg. Co. L. Rep. 235 (1956), the condemnee-farmer could not establish a reservoir as the highest and best use, in spite of the condemnation by a water company, since his land, unlike the properties in *Wadsworth*, *Brown* and *Gearhart*, supra, had no natural water or water basin on it at the time of the condemnation. Thus, by analogy, appellant could not, nor does it try, to argue that its property should be valued as a turnpike right of way. In its present condition the land is suitable for a reservoir, not a road.

Having thus disposed of the speculative use issue, we now turn to the second problem posed by this appeal: the relief desired by appellant. For more than a century it has been consistently held by this Court that in condemnation cases the measure of damages is based upon fair market value. *Rothman v. Com-*

---

[7] In citing these three cases we wish to make clear that we are using them only for the proposition that a condemnee is not bound by the use currently being made of his property if it is physically suited for some other purpose. These cases do not stand for the proposition that a condemnee farmer can recover reservoir damages when *no* demand for a reservoir exists other than that shown by the condemnation *and* where the farmer himself is unable to construct a reservoir. In each of these cases above there was evidence that other buyers were interested in the farmer's property for private reservoir use, thus establishing a market value for that use. Of course, when, as in the present case, the condemnee is a water company which can, *itself*, construct a reservoir, the absence of a market-value based on demand will not preclude the showing of a reservoir as the highest and best use. For a more complete discussion of the market value problem posed by this appeal see text infra.

*monwealth,* 406 Pa. 376, 178 A. 2d 605 (1962); *Mazur
v. Commonwealth,* 390 Pa. 148, 134 A. 2d 669 (1957);
*Dyer v. Commonwealth,* 396 Pa. 524, 152 A. 2d 760
(1959). Cf. *Schuylkill Navigation Co. v. Thoburn,* 7
S. & R. 411 (1821). More specifically, the condemnee
is entitled to the difference between the fair market
value before and after the taking.

However, in spite of this settled rule, appellant
seeks a somewhat unusual form of relief. If possible,
the water company would like to be able to purchase
another tract suitable for reservoir purposes, or in the
alternative, to erect a retaining wall on their existing
tract which would enable them to construct a reservoir
of the same size as that originally planned. In view
of the somewhat unique circumstances of this case, we
feel that appellant's prayer is not without merit. The
water company is a public utility with monopolistic
privileges within its own territory. Because of this,
there simply does not exist a market, in the classic
sense, for reservoir property. It is not traded between
water companies. Furthermore, as a public utility, ap-
pellant has not only the privilege, but the duty, to
supply its area with an adequate amount of water. To
do this requires that it replace or repair the property
taken by the turnpike; and this simply cannot be done
with $72,000. Finally, appellant offered to prove that
in spite of the fifty years during which the condemned
tract remained unimproved, the water situation in
Lackawanna County demands the construction of a new
reservoir.

Admittedly, the use of a replacement value or re-
pair test is a sharp departure from the traditional
measure of damages in condemnation cases; but it is
not a form of remedy foreclosed by decisions of this
Court. In *McSorley v. Avalon Borough School Dis-
trict,* 291 Pa. 252, 254, 139 Atl. 848, 849 (1927) it was
stated: "Evidence of the replacement value . . . should

not have been received, *unless* the circumstances were so peculiar as to render it absolutely essential, in the interest of justice, to require its admission." (Emphasis supplied.)[8]

We believe that the present case is precisely the type of situation envisioned by the *McSorley* court and that therefore appellant is entitled to repair or replacement value as the measure of damages. Nevertheless, we wish to make it quite clear that under normal circumstances fair market value remains the only available relief.[9]

Accordingly the judgment is reversed, a new trial granted and the case remanded to the trial court with instructions that the water company be permitted to introduce evidence on the issue of a reservoir as the highest and best use, as well as on the issue of replacement and repair costs.

Judgment reversed and record remanded with instructions.

Mr. Justice COHEN dissents.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I strongly disagree with the Opinion of the Court. The property involved has been owned and held by the

---

[8] In both *Sgarlat Estate*, supra note 5, and in *Dyer v. Commonwealth*, 396 Pa. 524, 152 A. 2d 760 (1959), an unsuccessful attempt was made to argue that market value should not be used. However, the former case involved an attempt to show anticipated profits, while in the latter, the Commonwealth contended that the market value of the condemnees' remaining uncondemned portion should have been increased by the value of a building which the condemnees, at their own expense, had moved from the condemned tract. Rather than depart from the standard test, the Court there wisely limited the Commonwealth to a trespass action for the wrongful removal of the building.

[9] We need not face the intricate question of how the issue of damages would be decided under the 1964 Eminent Domain Code, since the condemnation antedated the code's effective date. See Act of June 22, 1964, P. L. 84, 26 P.S. §§1-602 to 1-614 (Supp. 1966).

Pennsylvania Gas and Water Company in an unimproved condition for over fifty years, and there is no evidence or proof—there is nothing except hope and speculation by the Water Company—that there is now or in the reasonably foreseeable future there will be a need of this property for use as a reservoir. Furthermore, I disagree that replacement value has ever been or should be an appropriate test for recoverable damages in Eminent Domain proceedings. On the contrary, it has no probative value and is not proper evidence for any purpose. Cf. *Buhl Foundation v. Board of Property Assessment,* 407 Pa. 567, 180 A. 2d 900; *Metropolitan Edison Co.'s Appeal,* 307 Pa. 401, 161 A. 303; *McSorley v. Avalon Borough School District,* 291 Pa. 252, 139 Atl. 848; *Algon Realty Co. Tax Assessment Appeal,* 329 Pa. 321, 198 Atl. 49.

The test of damages (i.e., just compensation) to which an owner is entitled has heretofore been, and should continue to be, the difference between the market value of the entire property before the taking (unaffected by the taking) and the market value of the property after the taking. By "market value" is meant the price a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration the present use and all uses to which the property is adapted and might in the reasonable future be applied. *Ward v. Commonwealth,* 390 Pa. 526, 136 A. 2d 309. See also *Brooks Building Tax Assessment Case,* 391 Pa. 94, 137 A. 2d 273; *United States Steel Corporation v. Board of Assessment and Revision of Taxes,* 422 Pa. 463, 223 A. 2d 92; *Buhl Foundation v. Board of Property Assessment,* 407 Pa., supra.

DISSENTING OPINION BY MR. JUSTICE EAGEN:

The condemnee involved herein is an excellent public utility. Its officers and directors are the highest

type of individuals who continually strive to serve the public in the best possible manner. Nevertheless, the majority opinion in this case may result in giving the utility a windfall for which there is no legal precedent. I therefore must dissent.

It is well established that the owner of land taken through eminent domain is entitled to recover the difference between the market value of the whole tract before the taking, unaffected by the taking, and the market value of the land remaining after the taking, as affected by the taking. Market value is the price that a willing buyer with general needs would pay, or that a willing seller with general needs would accept for the property. Although a buyer with an extraordinary need might pay more than the market value, and although the owner thereof, because of its unique value to him, would not have sold for the same amount as an ordinary owner, the value for the purpose of justly compensating the condemnee for the taking is not the value which is placed thereon by these unique individuals, but rather the price that the property would bring at a sale in the open market. In short, the measure of relief in a condemnation case is not the "value" to the taker or to the owner, but the value to the average buyer in the market place.

Uses other than those to which the condemned property was devoted at the time of condemnation are relevant because they influence the market price of the property. See *Sav. & Trust Co. v. Pa. R.R. Co.*, 229 Pa. 484, 488, 78 A. 1039, 1039-1040 (1911); *Boom Co. v. Patterson*, 98 U.S. 403 (1878). For example, the market value of a private home in a thriving commercial district reflects the possibility of converting it from residential to commercial use. Since the owner prior to condemnation might have sold the house at a price representing its value for commercial use, he is permitted to show that use so that he will be indemnified

not solely for the loss of residential property, but also for the loss of a saleable commercial site. The adaptability of land to a particular use is not relevant, however, unless it appeals to the general or average buyer and thereby affects the market price of the land. *Sgarlat Estate v. Commonwealth,* 398 Pa. 406, 409, 158 A. 2d 541, 543 (1960) ; *Graham & Co., Inc. v. Pa. Tpk. Comm.,* 347 Pa. 622, 632-33, 33 A. 2d 22, 27-28 (1943) ; *Sav. & Trust Co. v. Pa. R.R. Co.,* supra. We have labeled as "speculative" a use for which there is no general demand. *Chiorazzi v. Commonwealth,* 411 Pa. 397, 192 A. 2d 400 (1963) ; *Ogden v. Penna. R.R. Co.,* 229 Pa. 378, 78 A. 929 (1911). Until today this has been the law of Pennsylvania.

Since the franchised water utility in this case has a monopoly on public water service, the adaptability of the condemned site to public reservoir use does not affect the price that an average buyer will pay for the site. The market value of the site depends on its adaptability to commercial, residential and recreational use. Consequently, the lower court properly disregarded the adaptability of the site to public reservoir use and based its assessment of damages on the value of the property for commercial, residential and recreational uses.

The majority here, however, would allow public reservoir use to be the "highest and best" use of the property in spite of the fact that the adaptability of the condemned site to this use is not an element of its market value. How, then, is a court to decide that, at the particular time and place involved in this case, a reservoir was more valuable than a housing project, a shopping center, or an alternative public use? What criteria can be used to judge whether a particular use is "highest and best" when its value compared to alternative uses is not appraised by the market? Where a decision on what is the "highest and best" use is un-

guided by the market, that decision becomes as completely subjective as the concept of value itself. See *Kimball Laundry Co. v. United States,* 338 U.S. 1, 5-6 (1949).

The majority's endorsement of replacement or restoration damages if a reservoir was needed at the time of condemnation and is determined to be the "highest and best" use of the property, is likewise an unreasoned and a dangerous departure from well settled law. The majority recognizes that the measure of relief in condemnation cases has consistently been based upon market value. Moreover, it concedes, as it must, that if the situation were reversed and the same land was condemned by the water utility, the private owner or condemnee could not collect on the basis that the land was adaptable to reservoir use unless he could also establish that a demand for private reservoirs exists to give the land market value for that use.[1] Why, then, is a different rule applied in this case?

The only reason suggested by the majority is that the utility has a duty to supply adequate water service in the area. It seems apparent, however, that the duty is part of the price that the utility pays for its exclusive franchise. It is a duty assumed in return for a monopoly on public water services at rates designed to give the utility a fair return on its investment. Why, then, should a public utility be entitled to more on condemnation than anyone else because of a duty it is otherwise paid to perform.[2]

---

[1] See *Boom Co. v. Patterson,* supra. Compare *Bitting v. Philadelphia Suburban Water Co.,* 73 Montg. Co. L. Rep. 235 (1956), with *Gearhart v. Clear Spring Water Co.,* 202 Pa. 292, 51 A. 891 (1902). If anything above market value were awarded on the condemnation of a public reservoir site, the owner-condemnee would be taking advantage of the public necessity for water services.

[2] In this case the cost of restoring or replacing the site is greatly in excess of the market value of the property taken. To

Let there be no mistake: it is the utility and its owners not the utility's customers, who would benefit from a payment in excess of market value. Water rates will be no lower because the utility receives a special benefit and will be no higher if it does not. Assuming that the condemned site is considered in rate-making,[3] the gain resulting from its condemnation is a nonrecurring income item that will not be included in the company's "operating revenues," used in rate-making by the P.U.C. to calculate the utility's return on its investment. If the company buys a substitute site or restores the partly condemned site to its original capacity, its investment, used in rate-making by the P.U.C. to determine what revenue is reasonable, will be no less because it is traceable to condemnation damages. See *Burgettstown v. West Penn Water Co.*, 29 P.U.C. 410 (1951).

Eminent domain cannot be exercised except upon condition that just compensation be paid to the owner. The compensation paid, however, must be just not only to the person whose property is taken but also to the taker (which generally is the public) who must pay for it. *Garrison v. City of New York*, 88 U.S. (21 Wall.) 196 (1874). This is the reason for the adoption of the market-value measure of condemnation damages. As this Court explained many years ago in *Searle v. The Lackawanna and Bloomsburg Railroad Company*, 33 Pa. 57, 63-64 (1859): "When the state takes private property for public use or authorizes it

---

be just compensation, restoration or replacement cost would always have to be more than the market value of the property taken. Anything less than market value would not indemnify the utility for loss caused by the condemnation because prior to condemnation the utility is able to sell the property at the market price. See *United States v. Miller*, 317 U.S. 369, 373-74 (1943).

[3] If the site is not part of the "rate base," any gain derived from it certainly will not affect rates.

to be taken, this market value is all that it pays for it. This is the necessary measure, *in order to avoid the favouritism or oppression that would attend any other measure.* Every man holds his property subject to this eminent domain, dominion, or ownership of the whole society. *He must give it up when society needs it, on being paid its value according to the estimate put on it in the market,* that is, by common consent." (Emphasis supplied.) See also, *Kimball Laundry v. United States,* supra.

I see no legal or moral justification for treating this case as an exception from the law as it has been formulated and followed for over a century. Since the majority opinion offers no reasons for its departure from well-settled law, it appears to me to invite favoritism toward utility owners, with a resulting unjust burden on those who pay condemnation damages.

I dissent.