In Re: Condemnation by the Pennsylvania Turnpike Commission of 79.42 Acres of Land in Jefferson Township, Somerset County and in Cook and Donegal Townships, Westmoreland County, Commonwealth of Pennsylvania in Fee Simple, Together With 0.61 Acre in Easement.

Argued October 20, 1970, before President Judge BOWMAN, and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and BARBIERI.

*Simon K. Uhl,* Local Counsel, with him *George H. Shaffer,* Assistant Counsel, *Jay R. Braderman,* Assistant General Counsel, and *John R. Rezzolla,* Counsel, for appellant Turnpike Commission.

*Albert M. Nichols,* with him *John F. Dent* and *Irving L. Bloom,* for appellees.

OPINION BY JUDGE CRUMLISH, JR., filed December 31, 1970:

On June 5, 1962, the Pennsylvania Turnpike Commission, exercising its authority of eminent domain, condemned, inter alia, 80.03 acres of land in a swath through 4,300 acres of land owned by members of the D. Hall Blair family.[1] The condemnation, for the Laurel Hill Tunnel by-pass of the Pennsylvania Turnpike, completely severed the Blairs' land into two unconnected tracts[2] of 1,600 acres and 2,620 acres. A Board of View appointed on the Commission's petition awarded damages in the amount of $60,000. The Blairs'

---

[1] D. Hall Blair of Indiana, Pennsylvania; Elizabeth Blair Hersh of Portland, Oregon; David Blair, Jr. of Ashland, Massachusetts; John P. Blair of Brooklyn, New York and Catherine Blair Lewis of Indiana, Pennsylvania, owned in varying proportions a total of more than 9,000 acres of contiguous land in the Laurel Mountains. For the purposes of this condemnation, it has previously been decided that 4,300 of these acres should be considered as the tract from which the 80.03 acres were condemned.

[2] "No longer are there any ways, bridges or other means of access from the northern 1,600 acre tract to the southern 2,620 acre tract across the new turnpike right-of-way nor any means of getting from one tract to the other is contemplated." LANSBERRY, P. J.

appeal to the Court of Common Pleas of Somerset County was heard by Judge LANSBERRY without a jury. The appeal resulted in an award of $196,000. The Commission has now appealed from the denial of its exceptions and request for a new trial.

It is for us to decide: (1) Was there sufficient evidence to support the court's finding that the highest and best use of the condemned land was recreational and residential and, (2) whether the court in valuing the condemned land in connection with recreational use, erroneously considered land not owned by the condemnees as being a necessary part of the valued land. We conclude that the court did not err in determining either issue.

The market value of condemned property need not be measured in terms of the existing use of that land. Instead, "the market value of a piece of property may reflect one of a number of possible uses to which the land has not been put at the time of condemnation. 'If these uses . . . would occur to the average buyer and influence him, they must enter directly into the market value of the land regardless of the uses to which the owner has theretofore applied the land.' Savings & Trust Company of Indiana v. Pennsylvania R. R. Co., 229 Pa. 484, 488, 78 Atl. 1039 (1911)." *Stoner v. Metropolitan Edison Co.,* 439 Pa. 333, 337 A. 2d (1970).

Recovery based upon a nonexisting use, however, may not be based upon "remote chances or future possibilities." *Stoner v. Metropolitan Edison Co., supra; Gilleland v. N. Y. State Natural Gas Corp.,* 399 Pa. 181, 159 A. 2d 673 (1960). "To prove a highest and best use the condemnee must establish that the land in question is physically adaptable to such use and that there is a need for such use in the area which is reflected in the market for the property at the time of the condem-

nation. Shillito v. Metropolitan Edison Co., 434 Pa. 172, 252 A. 2d 650 (1969); Pa. Gas & Water Co. v. Pa. Turnpike Comm., 428 Pa. 74, 236 A. 2d 112 (1967); and A. D. Graham & Company, Inc. v. Pa. Turnpike Comm., 347 Pa. 622, 33 A. 2d 22 (1943)." *Stoner v. Metropolitan Edison Co., supra* at 338. "[T]he manner of establishing this need is by demonstrating that a demand for it exists in the public market at the time the condemnation occurred." *Shillito v. Metropolitan Edison Co., supra* at 174.

The most cogent example of the demonstration of need is in *Stoner v. Metropolitan Edison Co., supra.* The Stoners presented qualified witnesses who stated that (a) the Stoners' farm was ready for sale for residential development; (b) similar development had reached similar areas in adjacent parts of the county; (c) development would soon come to the area in question; and (d) the property was well situated in regard to transportation facilities serving both the surrounding communities and the state. "Thus there was testimony as to an immediate market for part of the use proposed by the condemnee; there was further testimony of nearby development and the existence of objective conditions on the Stoner property which supported this kind of development." *Stoner v. Metropolitan Edison Co., supra* at 339.

The Blairs followed this pattern in establishing that recreational and residential use was the highest and best use of the land. They presented competent testimony to the effect that (a) their property was ready for such development;[3] (b) similar recreational areas had been developed in the mountain system containing

---

[3] In 1959, two years prior to the taking, the condemnees hired Neilan Engineers, Inc. to make a land use and feasibility study of the Blairs' holdings. This conclusion reached by this study was that the property should be developed as a commercial recreational area.

the condemnees' land; (c) the area in question was especially desirable for such development because of its land formation; and (d) the condemnees' land was strategically located in regard to access roads and areas of population density.[4] The evidence presented was sufficient to persuade the court that a buyer, at the time of condemnation, would have been influenced by the possible recreational and residential development of the property. We think it is conclusive that the award reflected this possible use.

In the presentation of evidence relating to recreational and residential use of the property, condemnees' presented proof of and thorough discussion of a feasibility study which they had professionally prepared relating to this proposed use. Part of that study was based upon future acquisition of neighboring properties which were then not owned by the Blairs. The Commission contends that the court erred in giving consideration to this plan in formulating a value for recreational use. This contention must fail in light of the following facts: (1) the evidence of the feasibility plan was admitted, over the Commission's objection, "in support . . . of the highest and best use of the land"; (2) the court below found that the evidence had a "very indirect reference or attachment to value . . . ."[5]

---

[4] The evidence presented on these factors, and indeed by all witnesses at the hearing, has been ably capsulized by Judge LANSBERRY in his extensive opinion filed below.

[5] United States v. Cox, 190 F. 2d 293 (10th Cir.) (1951), has been interpreted as excluding evidence relating to land not owned by the condemnee which attempts to establish the value of the condemned land based on a highest and best use in conjunction with the unowned, unoptioned land. See 27 Am. Jur. 2d §435 (1966). This holding, which has not yet been applied in Pennsylvania, does not control the case before us. The feasibility plan was offered to show that the land was suitable for recreational purposes and that transformation of usage was being undertaken. Subsequent testimony established that this plan could be modified to entail only the

Expert witnesses testified that they did not consider lands unowned by the condemnees in formulating their valuations. In fact, there was direct testimony that a recreational and residential development could have been developed within the confines of the condemnees' property.[6]

Where the expert witnesses have testified that they have not considered unowned land in their valuations, and where the award by the court is of an even lesser amount than these valuations,[7] we cannot find that the court was improperly influenced by plans showing proposed development of these unowned lands.

We shall not interfere with the verdict below unless "the verdict was so excessive or inadequate that the refusal of the court below to grant a new trial was a clear and manifest abuse of discretion or was unconscionable or shocking to the court's sense of justice." *Boring v. Metropolitan Edison Co.*, 435 Pa. 513, 257 A. 2d 565 (1969). In the instant case, the clear weight of the evidence supports the verdict of the court below. We affirm.

---

condemnees' land. The unowned land considered in the study was not material to establishing the value of the condemned land.

[6] This testimony was presented by Thomas McCaffrey, Jr., whose ample qualifications in valuing land in that area of Pennsylvania were the topic of a lengthy portion of Judge LANSBERRY's opinion. The judge concluded that this witness' knowledge of the area and of the available information far surpassed that of either valuation expert for the Commission.

[7] Five experts presented damage valuations for the condemned property based upon use as a recreational and residential development. Three of these valuations were $250,000, while the other two were $235,000 and $210,000. In addition, the owners, David Blair and D. Hall Blair, set the damages at $410,000. The two valuation experts for the Commission based their valuations upon other uses. One, basing his damage estimate upon timbering use, found damages of $48,000, while the other, basing his damage estimate upon the land being used as mountain land with limited recreational value, found damages of $64,000.