HUGHESVILLE–WOLF TOWNSHIP JOINT MUNICIPAL AUTHORITY, Appellant,

v.

Kenneth F. FRY, John R. Fry, Helen Fry, R. William Keller.

HUGHESVILLE–WOLF TOWNSHIP JOINT MUNICIPAL AUTHORITY

v.

Kenneth F. FRY, John R. Fry, Helen Fry, R. William Keller.

Appeal of Kenneth F. FRY, Appellant.

Commonwealth Court of Pennsylvania.

Argued Sept. 15, 1995.

Decided Dec. 28, 1995.

---

Marc S. Drier, for appellant/appellee Hughesville–Wolf Township Joint Municipal authority.

J. Michael Wiley, for appellee/appellant Kenneth F. Fry et al.

Before SMITH and KELLEY, JJ., and RODGERS, Senior Judge.

SMITH, Judge.

Before the Court is an appeal on behalf of the Hughesville–Wolf Township Joint Municipal Authority (Authority) and a cross-appeal on behalf of Kenneth R. Fry, John R. Fry, Helen Fry and R. William Keller (collectively, Condemnees) from an order of the Court of Common Pleas of Lycoming County (trial court) awarding Condemnees $162,080 for the Authority's taking of 17.99 acres in order to build a sewage treatment facility. The issues presented by the Authority are whether the trial court erred in finding "industrial development" to be the highest and best use for purposes of eminent domain land valua-tion and whether the trial court erred in setting an excessively high value for the condemned tract. The issues presented by Condemnees on cross-appeal are whether, once the trial court determined the highest and best use of the property to be industrial, the trial court's decision to modify Condemnees' expert's valuation of the property was supported by substantial evidence and whether the trial court erred in admitting evidence of potential archaeological significance to devalue a 3.8–acre portion of the taking.

I.

In early 1981 Condemnees purchased a 49.597–acre tract of land in Wolf Township, Lycoming County, which at all relevant times has been zoned for industrial use. Although they purchased the land as an investment for future sale as industrial property, it remains unimproved and has been farmed continuously since Condemnees' purchase of it. On March 30, 1993, the Authority filed a declaration of taking condemning 17.99 acres of the tract for the purpose of constructing a sewage treatment facility. Condemnees rejected the Authority's tender of $121,530 as just compensation and petitioned for the appointment of a board of viewers. A hearing was held before the board of viewers, which subsequently issued a report awarding Condemnees $172,704 in general damages for the taking. Both the Authority and Condemnees appealed and the trial court conducted a de novo trial.

Condemnees presented the testimony and appraisal report of Marlin H. Fields, an appraiser who concluded that the highest and best use of the property was light industrial. Fields, using a sales comparison approach, estimated the value of the taking to be $292,-000, or approximately $16,232 per acre. The Authority presented the testimony and appraisal report of F. Donald McKernan, an appraiser who determined that the property's highest and best use was agricultural or residential. McKernan, using a market data approach (comparable agricultural, residential or commercial sales in the area), deter-

mined the value of the taking to be $100,630.[1] Both parties presented additional evidence regarding market conditions and the demand for industrial property in the area. The trial court also conducted a site view of the land in question.

In its decision, the trial court determined that the highest and best use of the property was light industrial. This determination was supported by the trial court's findings that industrial use of the property is physically possible, legally permissible, financially feasible and maximally productive. In assessing market value of the property, the trial court accepted, with certain modifications, the general approach of Fields, Condemnees' expert. The court, however, reduced that value of the taking to $12,000 per acre based upon several considerations: (1) marginal access to the highway for heavy vehicles and vehicular traffic; (2) lack of municipal water or sewer at date of taking; (3) location of property several miles from a major arterial highway; and (4) that current inventory in the area, as well as current market conditions, would result in a very slow sale, therefore reducing market worth of the property as of the day of the take.

The trial court further found that the entire 17.99 acres was not available for sale as an industrial property, because 3.8 acres of the site have been designated by the Pennsylvania Historical and Museum Commission (historical commission) preliminarily as being potentially archaeologically or historically significant, and the cost to do additional studies to determine whether archeological or historical value actually exists would exceed any benefit to be obtained by the removal of that designation. As a result, the trial court accepted the Authority's valuation of these 3.8 acres at $1,000 per acre.[2] Both the Authority and Condemnees appealed.

II.

◼ The Authority contends that the trial court, in determining damages, erred in utilizing light industrial as the highest and best use, rather than the actual uses of residential or agricultural. It asserts that Condemnees failed to establish either economic feasibility of the particular site for industrial use or the existence of an actual current market in the area for industrial property. This Court's scope of review of the trial court's order is limited to a determination of whether the trial court abused its discretion, whether an error of law was committed or whether the findings and conclusions are supported by substantial evidence. *In re Condemnation of Property of Waite,* 163 Pa.Cmwlth. 283, 641 A.2d 25, *appeal denied,* 539 Pa. 657, 651 A.2d 543 (1994).

◼ A party whose land is taken for public use is entitled to just compensation. Section 601 of the Eminent Domain Code (Code), Act of June 22, 1964, Special Sess., P.L. 84, *as amended,* 26 P.S. § 1–601. Just compensation is defined by Section 602(a) of the Code, 26 P.S. § 1–602(a), as:

> the difference between the fair market value of the condemnee's entire property interest immediately before the condemnation and as unaffected thereby and the fair market value of his property interest remaining immediately after such condemnation and as affected thereby, and such other damages as are provided in this code.

Section 603 of the Code, 26 P.S. § 1–603, defines "fair market value" in relevant part as:

> the price which would be agreed to by a willing and informed seller and buyer, taking into consideration, but not limited to, the following factors:
>
> (1) The present use of the property and its value for such use.
>
> (2) The highest and best reasonably available use of the property and its value for such use.

---

1. Specifically, McKernan valued the take as follows: (a) 9.19 acres at $7,000 per acre, (b) 5 acres at $6,500 per acre, and (c) 3.8 acres at $1000 per acre.

2. The trial court further found that one acre of the land would be needed for roads or would be eliminated by wetland designation and should be given no value. These findings are supported by substantial evidence.

In *Gwynedd Properties, Inc. v. Board of Supervisors of Lower Gwynedd Township*, 160 Pa.Cmwlth. 599, 635 A.2d 714 (1993), *appeal denied*, 538 Pa. 628, 646 A.2d 1182 (1994), this Court stated that it is the condemnee's burden to establish that a use different from the present use of the property is its highest and best use. The condemnee must establish that the land in question is physically adaptable to the proposed use and that a need for such use exists in the area, which is reflected in the market for the property at the time of condemnation. *Appeal of Andorra Assocs.*, 128 Pa.Cmwlth. 6, 562 A.2d 953 (1989).

█ In the present case, Condemnees' expert concluded that the highest and best use of the land was industrial. The trial court accepted Fields' testimony and determined that industrial uses were physically possible, legally permissible and financially feasible. The trial court found that this property would be an attractive addition to Lycoming County's inventory of available industrial properties. Although the Authority presented evidence to the contrary, it is the duty of the trial judge, as the fact finder in eminent domain proceedings, to make credibility determinations and to resolve conflicts in the evidence. *McGaffic v. Redevelopment Auth. of the City of New Castle*, 120 Pa.Cmwlth. 199, 548 A.2d 653 (1988), *appeals denied*, 523 Pa. 644, 645, 565 A.2d 1168, 1169 (1989).

█ The Authority contends that Condemnees introduced no evidence confirming the economic feasibility of the site for industrial development and that, in fact, the Authority's evidence suggested a lack of economic feasibility in that there were site-specific problems, including *inter alia*, water table frailty, a sensitive fish nursery nearby and unsuitable soils for sewage disposal. To support its position, the Authority cites *In re Pennsylvania Turnpike Commission*, 1 Pa.Cmwlth. 66, 272 A.2d 279 (1970), where the Court held that the trial court could consider a professionally-prepared feasibility study showing that a recreational use could have been developed on the condemnees' property. That case does not stand for the proposition that a professional feasibility study is a legal require-

ment necessary to establish highest and best use; it states only that such evidence may not be excluded. In the present case, Fields testified that light industrial use of the land was physically possible. Fields further testified that, although he did not conduct a formal economic feasibility study, he did conduct an indirect feasibility study taking into account such factors as zoning, demographics, employment statistics, road systems, transportation facilities and public utilities. Accordingly, the trial court's finding that industrial use was the property's highest and best use is supported by substantial evidence.

█ The Authority also contends that Condemnees failed to establish that there is a current need for a large industrial development site in the area. In support, the Authority cites *Shillito v. Metropolitan Edison Co.*, 434 Pa. 172, 252 A.2d 650 (1969), where the Supreme Court stated that a bald assertion by the condemnee or his or her witness that there is a need for residential or industrial land in the area is not enough to establish that such a need exists. In the present case, the trial court found that the property would be an attractive addition to the county's inventory of industrial properties because it has relatively large acreage and would be available either to an industrial client who wanted a tract of land in excess of 20 acres or to one who wished to develop the tract into smaller industrial sites. This finding is supported by substantial evidence of record.

Jerry Scott Walls, the Executive Director of the County's Planning Commission, testified on cross-examination that there is a shortage in the county of large industrial tracts of approximately 20 acres or more, which are in high demand, and that this puts the county at a disadvantage with other areas. Walls further testified that since 1989, he has shown industrial sites in the area to at least 63 businesses and has sent out more than 300 packets of information to companies that have indicated interest in the area. Further, Walls testified that the area is highly desirable to large agricultural concerns who would want employees with a farm background. Accordingly, there is sufficient evi-

dence of record indicating a need in the area for this type of industrial site.

The Authority further contends that, even assuming industrial development is the highest and best use for property, the trial court erred in determining its fair market value to be $12,000 per acre. Specifically, the Authority argues that the two closest comparison sales of large tracts that Fields considered, compromised of 55.73 and 59.15 acres, had prices of only $8,250 and $4,565 per acre, respectively. In *In re Commonwealth, Department of Transportation,* 38 Pa.Cmwlth. 305, 393 A.2d 41 (1978), this Court noted that the trial court is entitled to disregard expert testimony in reaching a valuation figure where the trial judge, as he did here, personally views the property. Further, the two properties cited by the Authority as most similar were inferior to the subject site in that one of them lacked highway access and the other had steep terrain and no utility service. Additionally, several of the properties cited in Fields' comparison report had prices of $19,000 to $52,000 per acre. As a result, the trial court did not err in assigning a valuation to Condemnees' property that was higher than that of the two properties the Authority claimed to be most comparable.

### III.

On cross-appeal Condemnees contend that the decision of the trial court to modify Fields' valuation from $16,232 per acre down to $12,000 per acre was not supported by substantial evidence because Fields had already taken market conditions into consideration in arriving at his valuation. Although the trial court accepted Fields' approach to assessing the value of the property, the court disagreed with his valuation in light of current market conditions. There is ample evidence of record to indicate that current market conditions in the area would result in a slow sale. Accordingly, the trial court neither erred nor abused its discretion in finding the value of the taking to be somewhat less than that estimated by Condemnees' expert.

Condemnees further contend that the trial court erred in admitting evidence of the potential archeological significance to devalue 3.8 acres of the taking.[3] Condemnees argue that the only reason the site was determined to be potentially archaeologically significant was due to the condemnation procedure and that prior to the condemnation, the site had no such significance. Therefore, Condemnees, citing Section 602(a) of the Code, assert that the condemnation procedure itself impermissibly affected the fair market value of the property.

The Authority contends that the archaeological or historical designation is not the result of the condemnation but is a condition of the land that existed prior to the condemnation. The Authority argues that pursuant to 37 Pa.C.S. § 510, relating to approval of construction affecting historic resources, any project, building or other undertaking involving Commonwealth funds must have its potential archaeological and historical significance determined first and that most industrial development in the county involves state funds. Walls testified that most industrial developments in the county have occurred with some form of financial assistance from the state. As a result, even assuming that the property had not yet been determined to be potentially archaeologically significant, before any industrial development of Condemnees' property could take place, it most likely would have had to be screened for possible historical or archaeological significance. Possible historical significance is a pre-existing condition of the land and is not a result of the condemnation.

Condemnees also contend that the evidence of potential archaeological significance should have been excluded on the ground of unfair prejudice to Condemnees because McKernan, the Authority's expert, did not include this evidence as a valuation concern in his appraisal report until just 14

---

**3.** Condemnees contend that the actual size of this area is 3.68 acres rather than 3.8 acres and that they are entitled to an additional $1,440 as a result of the .12–acre discrepancy. McKernan's appraisal report, however, states that 3.8 acres of the tract has been designated as archaeological ground. As a result, there is substantial evidence for the trial court's finding.

days before the trial. Condemnees do not dispute, however, that an archaeological study of the property was conducted in February 1992, and the property was registered with the state historical commission before the March 30, 1993 declaration of taking. This restriction on the 3.8–acre tract, therefore, existed prior to the declaration of taking. Accordingly, the trial court did not err in admitting evidence of the property's archaeological designation.

■ Finally, Condemnees contend that the trial court's findings regarding potential archaeological significance and the cost of further testing are not supported by substantial evidence. David Peck, a professional engineer, testified that the land in question was registered with the historical commission as having potential archaeological or historical significance. Peck further testified that as a result, before the Authority could construct any facilities on the site, a Phase II study would have to be undertaken. Peck also testified that Jeff Bohlin, an archaeologist with the Appalachian Archaeological Research Company, had given him an approximate figure of $75,000 as the cost for the Phase II study of the site. McKernan, in his appraisal report, estimated the cost of a Phase II study at $50,000 to $100,000. The trial court's finding that the $75,000 cost outweighs the benefits to be obtained by removing the historical designation is supported by substantial evidence. The trial court did not abuse its discretion in accepting the Authority's valuation of the 3.8 acres, which was $1,000 per acre. In view of the foregoing, the order of the trial court is affirmed.

### ORDER

AND NOW, this 28th day of December, 1995, the order of the Court of Common Pleas of Lycoming County is affirmed.