147　　205
e 34 SC ²518

# Wallace *v.* The Jefferson Gas Co, Appellant.

[Marked to be reported.]

*Eminent domain—Damages—Pipe line.*

In an action to recover damages for injury to land by the laying of a pipe line, evidence as to the amount of land disturbed, the permanent occupancy of a part of it as a path to walk over for purposes of inspection or repair, and the injury to the crops, are legitimate subjects of testimony, the effect of which are entirely for the jury.

*Speculative damages—Coal mining—Support—Opinion.*

The opinion of a witness as to the probability of a pipe line breaking when the coal beneath it is removed, based merely upon theory, and not upon any known instance in which a pipe line had ever subsided or a pipe broken for want of support, is merely speculative and should be excluded.

*Evidence—Opinions of witnesses—Damages to coal lands.*

In an action to recover damages for injury to coal lands, it appeared that a gas pipe sixteen inches in diameter, was laid on plaintiff's land at a depth of three feet below the surface. The underlying coal was at a varying distance below the surface, ranging between 87½ and 217 feet, the average depth being about 143 feet. A number of witnesses testified that it was necessary to leave a wide strip of coal permanently underneath the pipe ; that if such a strip was not left, there was danger of the pipe breaking, and the gas being liberated into the mine below. None of this testimony was based upon any instances known to the witnesses where such breaks had occurred. *Held* that the testimony should be excluded.

*Increased cost of mining coal.*

Evidence of the depreciation of the market value of land founded upon the supposed increased expense of mining coal caused by the construction of a pipe line is inadmissible as too remote and speculative : Searle *v.* Railroad Co., 33 Pa. 57.

*Competency of witness.*

A witness will not be allowed to testify as to the quantity of coal which would be required to be left to support a pipe line, or as to the effect of the pipe line upon the value of the property, where he has not shown any

knowledge, experience, or other information that would enable him to answer the questions.

*Release of right of support.*

Where a pipe-line company releases to the land owner the right of support for its pipe, the element of possible damage from subsidence of the surface will not be considered. Penn Coal Co. v. Versailles Gas Co., 131 Pa. 522.

Argued Nov. 4, 1892. Appeal, No. 274, Oct. T., 1891, by defendant, from judgment of C. P. No. 1, Allegheny Co., June T., 1889, No. 114, on verdict for plaintiff. Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS and MITCHELL, JJ.

On May 4, 1889, James Wallace appealed from an award of viewers allowing him $1,000 damages for the depreciation in the value of his land caused by the laying of a pipe line by the Jefferson Gas Company.

At the trial it appeared that the plaintiff was the owner of a farm of 200 acres in Baldwin township, of which 140 acres was underlaid with bituminous coal. The coal lay at a depth of 87½ feet to 217 feet below the surface, the average depth being about 143 feet. The Jefferson Gas Company after having given bond, entered upon the farm and appropriated a strip thereof 270 rods in length and 10 feet in width, and on it laid at about a depth of three feet, a pipe line sixteen inches in diameter. Other facts are fully stated in the opinion of the Supreme Court.

When John Warner, a witness for the plaintiff, was on the stand, counsel for plaintiffs proposed to show a plot to the witness that he might ascertain definitely the depth of the coal underneath the surface. Objected to, objection overruled and exception. [1]

The same witness was asked the following question:

" Looking at exhibit No. 1, what would you say would be the likely consequence of damage to that farm on account of taking the coal out from under that pipe line ? Would it affect the value or would it not ? " A. " It would affect it." Q. " In what way ? " A. " To support the pipe and make it safe for the ground you would want 100 feet of coal all along under that pipe line." Objected to, objection overruled and exception. [2]

When Selwyn Taylor, a witness for plaintiff, was on the stand,

exhibit No. 1, which exhibits the depth of the coal beneath the pipe line as laid across the land of the plaintiffs, was shown witness, and he was asked whether, in his opinion as a mining engineer, the presence of such pipe line there affects the value of the Wallace property as coal property.

A. "I believe it does." Objected to as incompetent and irrelevant for the reason that the true test of damage is the difference between the market value of the property immediately before the laying of the pipe line and the market value of the property immediately after the laying of the pipe line, and the witness has not made himself competent by showing a knowledge of the values of real estate in this neighborhood taken as a whole. And furthermore that the value of the coal cannot be separated from the value of the surface but the whole must be taken together.

By the Court : " If you will change the wording from, 'as coal property ' to ' as a farm including everything above and below the surface,' we will let you ask the question." Exception. [3]

Q. " In this case, what do you consider from your experience to be the necessary width of a bed of coal left there to support that pipe line ? " Objected to, objection overruled, and exception. [4]

Q. " Would that fact," (the angle at which the pipe line passes over the coal) " affect the mining of the coal in the vicinity of their supporting bed left ? "

A. " It would add very much to the damage done to the property in the fact that in the mining of the coal under that property it must be mined in a certain face to the coal, just two directions, north 23 degrees east, and north 23 degrees west. We would have a diagonal cross line to work it and you have to work a certain irregular line to support the defects. They would of necessity have to leave more than the specified amount of coal in order to fully protect it." Objected to, objection overruled and exception. [5]

J. H. McRoberts, a witness for plaintiff, was asked this question :

Q. " From your experience as a mining engineer do you or do you not consider that that pipe line would be injured or might be injured by the taking out of the coal from under it ? "

By the Court: " We think the law is that a man may show damage to his farm that a larger amount of coal would have to be left under the pipe line for fear of its giving away and which would therefore effect its price as a whole." Objection overruled and exception. [6]

Q. " Would it," [the pipe line] "increase the difficulties" [of mining the coal] " any, would you have to take any precautions that you otherwise would not have taken? " Objected to, objection overruled and exception. [7]

Q. " Do you know anything about what the drainage would be of that James Wallace tract? I refer to the position and location, the facility of draining it for the coal." Objected to.

By Mr. Allen: " The object is to show that the property is worth more because it can be drained easily." Objection overruled and exception. [8]

COLLIER, J., charged in part as follows:

" This is an action brought by a landowner to recover damages for injury to his land, alleged to have been occasioned by the defendant company laying a line of gas pipe through his farm. The Gas Company, under the law of our state, has the right to go through any piece of property on the sole condition that they pay the damages, and that makes the question in this case simply one of business. Gas companies have the right to go through any farm, and no matter how annoying it may be to the owner he has to submit to the law of the land, having his remedy in damages. The plaintiff alleges he has suffered damages, and the witnesses give different amounts. He alleges that his farm, with the coal under it, would not sell for as much immediately after the pipe line went through it as it would before. It is alleged that the Gas Company takes a strip of ground ten feet wide and so many rods long; that the earth has not been put back level, and requires smoothing and filling, and that they cut up the ground and destroyed some of the crops. Another reason given for the decrease in value is that the property is underlaid with coal, and this being a large gas main, sixteen inches I think, and high pressure, there is danger to the mine when it is worked. It is alleged for those reasons, together with some others, that the market value of the farm has decreased, that this pipe line tended to lessen the market value of the property, that if he wanted to sell it

immediately afterwards as it then stood with the coal under it, purchasers would not give as much for it in the market as they would before the pipe line was there.   There are a great many things in the evidence you need not bother yourselves about; direct your attention to the evidence tending to show the market value of the property before and after the pipe line was placed there.   If you believe that the plaintiff, immediately after the pipe line was put there, could have sold his farm as it then stood, with the coal under it, for as much as he could before, then he has not sustained any damage; and the law does not give him any cause of complaint.   But if the farm would sell for less, as some of the witnesses testify, after the pipe line was put there, and by reason of the pipe line being put there, then whatever that depreciation is would be the measure of damages, and that you give him.   Some of the witnesses testify to much larger amounts than others; there is a wide field for your consideration.   Several testify that the only damage to the property is the injury to the crops upon the ground, the taking of so much ground for the purposes of the Gas Company and the cost of filling up.   On the other hand some of the witnesses testify that the damages would be at least $40 or $50 an acre, and on down to $25 an acre; and the only thing you can do is to be reasonable and careful, and not be carried away by extremes on one side or the other; give the plaintiff what you believe is the fair difference in the market value before the pipe line came there and immediately after, if there is any difference.   That is what he is entitled to, and he is entitled to no more under our law.   That is a simple question, but you may have some trouble in coming to a conclusion under the testimony."

The defendant presented, inter alia, the following point:

10. Estimates of the depreciation of the market value of plaintiff's land founded on the supposed increase of cost of mining the coal caused by the construction of the pipe line, are too remote and speculative to be considered by the jury, and the opinion of plaintiff's witnesses, McRoberts and Taylor, as to such depreciation, being based upon this theory should be disregarded.

Answer : Refused.   You may take into account the fact of the gas pipe being there, and the evidence as to the danger of

the gas escaping into the coal mine, and whether that would depreciate the value of the farm, coal and all, as a whole. [9]

*Errors assigned* were (1, 4, 6, 7, 8) admission of certain testimony, quoting the questions but not the answers; (2, 3, 5) rulings on evidence, quoting questions and answers; (9) refusal of point, quoting point and answer.

*John D. McKennan,* for appellant.—Taylor and McRoberts showed no particular knowledge of the market value of land in the neighborhood of that of the plaintiffs. They testified chiefly as to the coal, and based their estimates of the damage done to the whole farm upon the amount of injury to the coal. Such testimony was inconsistent with the ruling of the Supreme Court in Searle v. R. R. Co., 33 Pa. 64; R. R. Co. v. Balthaser, 119 Pa. 472; 126 Pa. 1.

The value of the amount of support needed cannot be taken as the extent of the depreciation of the market value of the land: Penn Coal Company v. Versailles Gas Co., 131 Pa. 522.

The contingencies mentioned by the witnesses were remote, and should not have been taken into consideration in estimating the depreciation in the market value of the land.

*Edward F. Hays,* of *Hays & Noble,* for appellee.

The testimony of Warner, Taylor and McRoberts was necessary, as a description of the farm and of the physical effect of the easement upon it with reference to the right of surface support, in connection with the fact that the farm was underlaid with coal, which was then being mined. The testimony of these witnesses was entirely different from that offered in Searle v. Railroad Company, 33 Pa. 64.

The distinction between the present case and Railroad Company v. Balthaser, 119 Pa. 472; 126 Pa. 1, lies in the fact that in the cases cited, the quantity, quality and value of the stone and coal when quarried and mined were attempted to be shown instead of the quality, quantity and value of the land as mineral land, as in the present case.

Under the decision in Penn Coal Co. v. Versailles Gas Co., 131 Pa. 522, it was competent to prove the amount of support necessary for the pipe line. The increased cost of mining coal may be shown as an element of damage; Newark Coal Company v. Upson, 40 Ohio St. 17; Brown v. Corey, 43 Pa. 495;

Pa. R. R. Co. v. Hottenstine, 47 Pa. 28.   So in railroad cases
the cost of fencing may be shown : P., N. Y. & C. Co. v. Bun-
nell, 81 Pa. 414; Watson v. P. & C. Railroad Company, 37
Pa. 469; E. Pa. Railroad v. Heister, 40 Pa. 53; P. V. & C.
Railroad v. Rose, 74 Pa. 362.

The measure of damages must not be confounded with ele-
ments of damage, evidence of which is admitted for the purpose
of enabling the jury to apply the rule : Sedgwick on Dam-
ages, section 1163.   Evidence upon all matters bearing upon
the location, condition and quality of the land in question is
admissible : Curtin v. Nittany V. R. Company, 135 Pa. 20.

The opinion of Taylor was perfectly competent on the ques-
tion of values: Kellogg v. Krauser, 14 S. & R. 142; Brown
v. Corey, 43 Pa. 506; Pennsylvania Railroad Co. v. Henderson,
51 Pa. 321.   Whether a witness is an expert qualified to pos-
sess an opinion is merely in the discretion of the court below.
The Supreme Court will not reverse unless in a clear and strong
case : Sorg v. German Evangelical St. Paul's Congregation,
63 Pa. 156 ; Delaware and Chesapeake Towboat Company v.
Starrs, 69 Pa. 36.

OPINION BY MR. JUSTICE GREEN, January 25, 1892.

We experience difficulty in disposing of this case, on account
of the character of the most important testimony in support of
the plaintiff's claim of damages.   The charge of the learned
court below was substantially correct, and in accordance with
our decisions in this class of cases.   Yet the testimony as to
the most serious cause of damage, alleged by the plaintiffs, was
of such a speculative, remote, and imaginary character, that
we do not feel at liberty to give it sanction.   So far as the tes-
timony goes, in relation to the injury to the surface of the
ground, there is no ground of complaint.   The amount of land
disturbed by laying the pipe line, the permanent occupancy of a
part of it as a path, to walk over for purposes of inspection or
repair, and the injury to the crops, were legitimate subjects of
testimony, and the effect of it would be entirely for the jury.
But there was a much larger cause of damage set up by the
plaintiffs, and testimony was given in support of it, with which
we are not satisfied.   It was of this nature : The plaintiffs' land
was largely underlaid with bituminous coal.   The defendant

laid a gas-pipe, of sixteen inches diameter, over the surface of plaintiffs' land, at a depth of three feet below the level of the ground.  The underlying coal was at a varying distance below the surface, ranging between 87½ and 217 feet, the average depth being about 143 feet.  It was claimed by the plaintiffs that they were damaged by the necessity of leaving a wide strip of coal permanently underneath the pipe, so as to be at all times a sufficient support for the pipe, and, therefore, the same could not be sold.  It was also claimed that there was danger in the mining of the coal, in that, if the surface should sink, it might cause a break in the pipe, and a consequent liberation of the gas, which would, or might, find its way down through the ground into the chambers where the coal mining was going on, and cause serious damage there.  Testimony was admitted, under objection and exception by the defendant, in support of these theories, and, upon the supposition that the theories were correct, witnesses testified to an opinion that the market value of the entire farm was diminished by sums varying from a few dollars an acre to fifty dollars an acre.

The difficulty we have with this kind of testimony is that it is not founded upon any actual facts within the knowledge or experience of any witness, but entirely upon theory and imagination.   Thus, no witness testified that he had ever known an instance in which, as a matter of fact, the surface beneath a pipe line had actually sunk in consequence of taking out the coal at a distance of 140 feet or at any other distance below the surface.   It was all a matter of conjecture.   Such a thing might happen, or probably would happen, but no one knew that it would happen.   Nor did any one testify, from actual experience, that, if the pipe did break, the gas, instead of escaping through three feet of overlying surface, would penetrate downward, through the solid earth or rock, a distance of one or two hundred feet, and enter the chamber of any mine in that vicinity.  There was no such proof, or anything of that character.   But there was plenty of theory that all this might happen, and, if it did happen, much damage might be done, an explosion, like that of fire-damp, might take place ; and, on the strength of these theories, the witnesses testified to an opinion as to the amount of damage.   One witness said he would not be willing to buy the land at any price if the pipe line was laid over it.

An illustration of the character of the evidence occurs in the testimony of one of the plaintiffs' witnesses, who was asked to state why it would be unsafe to take the coal out from under the pipe, and said : " The matter is a very simple one.   The mines, as we operate them, are ventilated by a powerful ventilating apparatus, usually drawing air from whatever open place there may be through the mine.   If a break, by reason of taking coal out from under the pipe line, should occur, break in the surface, as is often the case, it would form an inlet for the air ; a break in the pipe would be caused by the .same fault, would be very likely, and the gas, escaping, would be naturally carried into the mine, and a very small body of the gas in the mine, coming in contact with the air, would explode.   You would have the same result as the explosion of fire-damp in a mine.

The whole force of this testimony depends upon an uncertain and problematical event, which may never occur.   " If," says the witness, " a break, by reason of taking the coal out from under the pipe line should occur . . . . it would form an inlet for the air.   A break in the pipe would be caused by the same fault, would be very likely, and the gas, escaping, would be naturally carried into the mine," etc.   That is, if a break through the earth and rock, from the surface down to the mine, should occur, a break in the pipe would be very likely to occur, and, if it did occur, the escaping gas might, or would, naturally be carried down into the mine, and might cause an explosion.   The witness did not, at any stage of his examination, say that he had ever known such a thing to happen, nor did any other witness testify to that effect; yet the witness, proceeding upon the idea that his theory would necessarily be verified in actual experience, testified, later on, and under exception, that " to be on the safe side," though it was a hard question to answer, " he would leave a strip of coal 100 feet wide, at the depth at which this coal laid, to support the pipe line at the surface."   On cross-examination he modified this by saying it might be done with a less width of coal than 100 feet, but that he thought that he would not leave less than a strip 60 feet wide.   In estimating the decrease in the value of the farm he assumed the length of the strip at 160 or 170 rods, and said : " I would say that the value of it was decreased about $12 to $15, according to my calculation, depre-

ciated on the whole." He only valued the farm, coal and all,
at $200 an acre, but he estimated the value of the strip 100
feet wide and 160 or 170 rods long, and apparently deducted
the resulting price of the coal left in place from the whole
value of the farm, and reached the conclusion that the entire
202 acres were reduced $12 to $15 per acre on account of the
supposed necessity for leaving this strip of coal in place. His
estimate was the most moderate of all the witnesses for the
plaintiff, but the other witnesses, adopting his method, but
valuing the land at $400 or $450 per acre, reached very much
larger results, one of them $50 an acre, and another $100 per
acre, as the amount of decrease of value in the entire farm.
The amount of damage by diminution of value on account of
the strip, as estimated by the witness last referred to, was
$20,000 or $40,000, accordingly as his testimony was consid-
ered by the jury. He was the witness, J. Rath, and was
asked in regard to the decrease in value: " Q. Have you a
judgment about it, or an opinion? A. It would be worth, I
suppose, a hundred dollars or two less at the present time
than it was before the pipe line went across. Q. Do you
mean the farm would be worth $100 less an acre? A. Yes,
sir, $100 less an acre." This ridiculous testimony was the
natural result of the vicious method allowed to be pursued by
the witnesses in ascertaining the amount of the diminution in
value on account of the presence of the pipe line. The whole
quantity of coal which might be left in place to support the
surface, on the theory that the strip should be 100 feet wide and
170 rods long, was testified to be about 12 acres, and even at
$400 an acre, which was an exaggerated estimate, would
amount only to $4,800, yet he was able to testify, and did, that
the amount of the diminution was $100 an acre on the whole
farm of 202 acres, 67 of which had no coal at all underneath,
and of the remaining 137 acres of coal only 12 acres were re-
quired to be left in place by the theory upon which all of this
testimony was based. The witness, Taylor, estimated the
value of the whole farm at $200 an acre including the coal,
and that a strip 60 feet wide would take about 8 acres. Ac-
cording to this the actual reduction in value for loss of coal
would be $1,600.

The speculative and imaginary character of this kind of evi-

dence is more strongly illustrated by the testimony of another
of the plaintiff's witnesses, who manifestly had very little con-
fidence in the theory that a strip of coal 100 feet wide must be
left in order to support the surface. It was the witness Mc-
Roberts, called by the plaintiffs.    He was a civil engineer,
and an expert in coal-mining. He said: "If I had charge of
the mining of the coal, I would go on and take it out regard-
less of the pipe line and run the risk—try and protect myself
as best I could." He said, further, it would be very hard to
say how much the market value of the land would be dam-
aged, but thought the whole thing taken together ought to be
worth seven to ten per cent less per acre than it would be
without the pipe line.    He was asked: "Q. Then this strip
that would have to be left would take about twelve acres?
A. No, sir; I didn't say it would have to be left.    I say if I
was mining the coal I wouldn't leave it. . . .    Q. Now, what
would be the necessity for leaving a pillar of coal there?
A. I don't know that there would be any; that was your pre-
sumption, and I am deciding upon that.    Q. If there is any,
what is it?    A. To support the pipe line.    Q. If their pipe
line was not supported what would be the result?    A. Possi-
bly nothing; if I were mining that coal, as I have testified,
I would not leave that pillar; I would take the risk and guard
against accidents all I could, and take the result when it
would come, and then try and settle with the gas company,
just as we did in one case I was interested in, if you remem-
ber.    That is the true way to settle a question of this kind
with regard to coal." In reply to another question, he said:
"This gas when liberated would obey the universal law of
nature and flow towards the weakest point of resistance.    If
that is in the mine it is hard to tell what the result would be,
and for that reason we can't tell what the result would be.    I
would let the coal alone until I practically mined the coal and
found out.    Q. Do you regard a risk of that sort as remote or
imminent?    A. Well, in this case it is possibly a little re-
mote." After testifying further to the remoteness of the risk.
and its probable value at seven per cent in the additional care
required in the mining, and the probability that the surface
could be let down without breaking the pipe, he was asked:
"Q. As to what amount of breakage of the soil would be nec-

essary to cause a rupture of this pipe line, you have only an opinion, and not founded upon any actual experience? A. No, sir. That is simply my opinion as a mining engineer. If you could let the surface sink at once, as you intimated by your question, you could possibly drop it; there is a bare possibility you might drop that entire surface and not injure the pipe line. Q. When you let it down, is there much likelihood of the surface from 87 to 200 feet breaking in places? A. Yes, sir. After the coal is mined out of Mr. Wallace's if you travel over that premises you will see the surface undulating. To a party going over the land without knowing what is the matter, it will excite his curiosity. Q. Will that be to the extent of breaking a wrought-iron pipe? A. Well, possibly not; I don't think it will break the pipe. I think it would strain it enough to possibly liberate the gas. Q. Isn't there more of a likelihood that that gas will go up to the surface, two or three feet distant, than go down into the mine? A. Yes, sir. Q. Isn't the risk of gas getting down into the mine a remote one? A. Well, yes, sir, I think it is. That is what I have testified in this case. I think it is remote, yet it is possible. Q. Do you know of any pipe lines in this neighborhood being constructed over coal land which has been worked since the pipe line was put there? A. I don't know that I do. I can't recall. There is no doubt numerous instances of that kind. Q. You don't know of this result having happened? A. No, sir."

The testimony of this intelligent and candid witness for the plaintiffs has been quoted in order to show the remote, speculative, uncertain and doubtful character of the testimony, and the theory upon which the plaintiffs' claim in this respect is founded. Not a single witness testified to the fact that a pipe line at an average distance of 140 feet above the coal actually required support from the coal underneath, or that any breakage of a pipe had ever occurred where the coal was all taken out at such a distance. Not a witness knew of the escape of gas down into the ground a distance of 140 feet, or any distance, instead of escaping above into the open air, a distance of three feet. Not a witness knew that a strip of coal 100 feet wide the whole length of the pipe line would be required to support the pipe above. No instance in which a pipe line had

ever subsided, or a pipe broken for want of support, was proved, although the witness McRoberts said there were numerous instances of pipe lines being laid over coal lands. No witness testified that there would be any subsidence at any depth over 100 feet below the surface. All of this testimony was merely speculative, imaginary, theoretical, and the most of it extremely doubtful, and founded upon possibilities which were remote and uncertain, yet the great bulk of the plaintiff's testimony on the subject of damages was made up of just this kind of proof. We think it comes within the operation of several of our decisions declaring that testimony of such character should be excluded.

The case of Searle v. R. R., 33 Pa. 57, is, perhaps, more nearly analogous to this than any other in our books. On the trial of that case the plaintiff offered to prove that the tract in question was coal land, and that the defendant's railroad crossed it in such place and manner as materially to increase the expense of mining his coal. The offer was rejected on the ground that the damages claimed were speculative, which might never accrue. This court sustained the court below, holding that it would be purely speculative to allow the plaintiff to recover the value of the coal which was required to be left for the support of the railroad, or damages for the increased expense of mining the coal, and that the only true measure of the damage would be the difference in the value of the land as ordinary coal land before and after the road was built.

Other cases in which speculative and remote or uncertain damages have been condemned are Pittsburgh, etc., Ry. Co. v. McCloskey, 110 Pa. 436 ; Reading & Pottsville R. R. v. Balthaser, 119 Id. 472 ; Chambers v. South Chester, 140 Id. 510.

The case of Penn Coal Co. v. Versailles Gas Co., 131 Pa. 522, is not at all in conflict with any of these cases. It recognized the right to support on the part of the gas company. And the right of the owner of the coal for compensation for the coal which he would be obliged to lose for the support of the surface, but " this is to be ascertained not by a calculation of the quantity of the coal, but by the effect of the appropriation on the tract as a whole."

In the present case the learned court below recognized this rule and endeavored to enforce it. But we think the testi-

mony took too wide a range, and especially was of too remote and speculative a character in many of its details, as we have endeavored to point out.

We sustain the 2d assignment of error because the witness had not shown any knowledge, or experience, or any other means of information as to the width of the strip of coal which would be required to be left to support the pipe line.

We do not sustain the 3d assignment because the witness was not asked at that time to testify as to how much the value of the land was affected, but only whether it would be affected at all by the presence of a pipe line.

We sustain the 4th assignment, because the witness had not qualified himself to answer the particular question asked, by stating any knowledge, experience or other information that would enable him to answer the question. The only reasons he did give for his belief were purely conjectural and conditional, and were also speculative and remote.

We sustain the 5th assignment on the authority of Searle v. R. R., supra, because the additional cost of mining the coal on account of the manner in which the pipe line crosses the coal is not an element of damage.

We sustain the 6th assignment because the witness testified it was altogether uncertain whether the pipe line would be injured or not, and that he considered the probability of injury to the mine by the escape of gas as remote, and had not qualified himself by any previous testimony to give a definite answer to the question.

We sustain the 7th assignment under the authority of Searle v. R. R., because the increased cost of mining is not an element of damage. For the same reason we sustain the 8th assignment.

We sustain the 9th assignment, because we think the 10th point of the defendant should have been affirmed without qualification.

The first assignment is without merit, and is dismissed.

We said in the case of the Penn Coal Co. v. The Versailles Gas Co. that if the latter company would file a stipulation, agreeing to be bound by the release of the owner of the surface, of the right of support, and accept the risk of subsidence, the injunction would be refused. And so we say here, that if

the defendant Gas Co. will file a release of the right of support in this case, or deliver it to the plaintiffs, the element of possible damage from the subsidence of the surface will be eliminated from the case. The possibility of injury from gas escaping downward to the coal instead of upward to the air, is, under the evidence, too doubtful, remote, and speculative to be considered as an element of damage.

Judgment reversed, and new venire awarded.