IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Condemnation of Permanent and    :
Temporary Rights of Way for the    :
Transportation of Natural Gas in    :
Buffalo Township, Washington County, :
Pennsylvania, Over Lands of    :
Dr. Larry G. and Mary P. Smith by    :
National Fuel Gas Supply Corporation   :
   :
   :
Dr. Larry G. Smith and Mrs.    :
Mary P. Smith, husband and wife,    :
   :
       v.    :
   :
National Fuel Gas Supply Corporation   :
   :
Appeal of:    :   No. 1093 C.D. 2017
Larry G. Smith and Mary P. Smith   :   Argued: May 7, 2018


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON      FILED: June 13, 2018


       Appellants Larry G. Smith and Mary P. Smith (Smiths) appeal from the July 7, 2017 order of the Washington County Court of Common Pleas (trial court) denying their motion for a new trial and directing the Prothonotary to enter judgment in favor of National Fuel Gas Supply Corporation (National Fuel). Upon review, we affirm.

In January 2011, National Fuel, a natural gas company regulated by the Federal Energy Regulatory Commission, began this condemnation action by filing a Petition for Approval and Order Filing Bond by Petitioner-Condemnor National Fuel Gas Supply Corporation (Petition). The Petition sought a 50-foot-wide eminent domain easement running the length of the Smiths' property to allow for the construction and installation of an underground 20-inch high-pressure gas transmission line across the property. On February 10, 2011, the trial court entered an order approving the Petition and granting the requested easement (Taking).[1]

Unable to agree on the appropriate amount of just compensation due the Smiths under Pennsylvania's Eminent Domain Code[2] for the Taking, the parties participated in a hearing before a board of view on October 20, 2011. The board of view issued a report and just compensation award from which the Smiths appealed seeking a trial *de novo*, as allowed by the Eminent Domain Code. *See* 26 Pa. C.S. § 516. The trial court scheduled a trial to begin on January 9, 2017 to determine the amount of just compensation due the Smiths pursuant to the Eminent Domain Code as a result of the Taking.

The parties then caused multiple assessments to be conducted for the purpose of determining the just compensation amount to which the Smiths were entitled as a result of the Taking and disclosed their respective appraisers and reports to one another. The Smiths identified Dennis Cestra, David Vogel, and Francis R. and/or Paul Chiappetta of the Chiappetta Agency, Inc. (collectively, the Smiths'

---

[1] The trial court granted National Fuel a permanent 50-foot-wide easement running the entire 2,007-foot length of the Smiths' property, which encumbered a total of 2.3 acres of the Smiths' 117-acre property. The trial court also granted a temporary construction easement situated one foot on the northern side and 15 feet on the southern side of the permanent easement, containing a total temporary easement of 32,112 square feet, or 0.74 acres.

[2] 26 Pa. C.S. §§ 101-1106.

Appraisers) as their appraisers. The Smiths served the Smiths' Appraisers' reports on National Fuel in addition to a report by an engineer, James E. Gillett, dated October 20, 2016, and titled "Historical Sample of Damage From Natural Gas Transmission Pipelines Explosions" (Gillett Report), upon which the Smiths' Appraisers had partially based their reports. National Fuel noticed its intent to present the report (Hayden Report or Hayden Appraisal) and testimony of Gary Hayden and Gary Ciarimboli, both of Hayden Appraisal Services (National Fuel's Appraisers), at trial. Each parties' expert appraisals contained similar pre-easement assessment valuations as follows: David Vogel reported a value of $1,650,000.00; Hayden Appraisal Services reported a value of $1,464,000.00; Dennis Cestra's reported value was $1,300,000.00; and Francis Chiappetta reported a value of $1,430,000.00. Supplemental Reproduced Record (S.R.R.) at 24b, 105b, 255b & 374b. The parties' experts' post-easement net diminution valuation amounts, however, varied considerably. As to these valuations, the Hayden Appraisal reported the net diminution of value at $58,500.00; the Cestra appraisal reported $464,000.00; the Chiappetta appraisal reported $500,000.00; and the Vogel appraisal reported $1,339,200.00. *See* S.R.R. at 105b, 255b, 374b & 4b, respectively.

Prior to trial, National Fuel and the Smiths each filed motions in limine seeking the preclusion of the other side's expert testimony and reports.[3] On the morning of the trial date, January 9, 2017, prior to the commencement of the trial, the trial court heard argument on the motions in limine and issued two orders. The

---

[3] National Fuel styled its motion as "Motion in Limine to Exclude the Testimony and Appraisal Reports of David E. Vogel, Dennis Cestra, Francis Chiappetta and Paul Chiappetta, and Testimony or Reports on Indefinite, Theoretical or Remote Damages." *See* Reproduced Record (R.R.) at 3a-26a. The Smiths' motion in limine, which they styled as "Motion for Protective Order in Limine to Disqualify Expert Report and Testimony," sought to disqualify the expert report Hayden Appraisal and the testimony of Gary Ciarimboli. R.R. at 27a-57a.

first order denied the Smiths' motion in limine. *See* Trial Court Order, filed January 9, 2017, Reproduced Record (R.R.) at 100a (First Order). The second order partially granted National Fuel's motion in limine by excluding and striking both the expert report of David Vogel[4] and the Gillett Report, and further provided that:

> All testimony and reports, expert or otherwise, that relate to or incorporate indefinite, theoretical or remote damages, including but not limited to pipeline explosions, burn areas, potential impact, blast zones and perceived risks associated with proximity to natural gas pipelines is precluded, without supporting market data.

Trial Court Order, filed January 9, 2017, R.R. at 99a (Second Order).

After the trial court ruled on the motions in limine, the Smiths did not request a continuance to either obtain new expert reports or otherwise modify their existing expert reports. During trial, the Smiths did not present the testimony of any valuation experts. Instead, the Smiths offered only their own testimony as the former owners of the property.[5] *See* Notes of Testimony (N.T.) 1/10/2017 at 55-160; R.R. at 155a-260a; N.T. 1/11/2017 at 171-83; R.R. at 271a-82a. Larry Smith testified that the correct just compensation was $660,000.00. N.T. 1/10/2017 at 129; R.R. at 229a. For valuation purposes, National Fuel presented the testimony of Gary Ciarimboli of Hayden Appraisal Services, who testified consistent with the Hayden

---

[4] The Smiths announced their intention to withdraw the Vogel Report prior to trial in their pretrial statement and during argument on their motion in limine. *See* Notes of Testimony (N.T.) 1/9/2017 at 10-11.

[5] Larry Smith testified that, in 2010, prior to the Taking, he sold Consol Pennsylvania Coal Company an option to purchase the Smiths' property for $1,550,000.00 without mineral rights and $1,901,000.00 with mineral rights. N.T. 1/10/2017 at 104-07; R.R. at 104a-07a. Mr. Smith further explained that the Smiths sold their property in 2012 for $890,000.00. N.T. 1/10/2017 at 96-99; R.R. at 96a-99a.

4

Report and valued the correct just compensation amount at $58,500.00. *See* N.T. 1/11/2017 at 186-256; R.R. at 286a-356a.

On January 11, 2017, the jury returned a verdict awarding the Smiths $58,500.00 as just compensation for the Taking. N.T. 1/10/2017 at 321-24; R.R. at 421a-24a, 427a. The Smiths filed a Motion for Post-Trial Relief requesting a new trial two days later. *See* R.R. at 428a-60a. On July 6, 2017, the trial court issued its Order and Memorandum denying the Smiths' post-trial motion and directing entry of judgment on the jury's verdict. R.R. at 487a-91a. The Smiths timely appealed to this Court on July 20, 2017.[6]

In eminent domain cases, this Court reviews whether the trial court committed an abuse of discretion or error of law. *Lang v. Dep't of Transp.*, 135 A.3d 225, 228 n.8 (Pa. Cmwlth. 2016). Further, we note:

> The decision to order a new trial is one that lies within the discretion of the trial court. When determining whether the trial court abused its discretion, the appellate court must confine itself to the scope of review. Where, as here, the trial court has provided a specific reason for its ruling on a request for a new trial, and it is clear that the trial court based its decision on that reason, the appellate court must apply a narrow scope of review and may only reverse the decision of the trial court if it finds no basis on the record to support the reason of the trial court. Absent a clear abuse of discretion, an appellate court will not interfere with a trial court's authority to grant or deny a new trial.

_____

[6] On July 26, 2017, the trial court ordered the Smiths to file a Pa.R.A.P. 1925(b) Concise Statement of Errors Complained of on Appeal, and the Smiths complied on August 14, 2017. Thereafter, on September 1, 2017, and September 13, 2017, the trial court issued an Order and Amended Order, respectively, indicating that it would rely on the Memorandum portion of its July 6, 2017 Order and Memorandum as its Pa.R.A.P. 1925(a) opinion in the appeal of this matter.

> Discretion is abused when a trial court's decision represents not merely an error of judgment but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Lahr v. City of York*, 972 A.2d 41, 52 (Pa. Cmwlth. 2009) (internal citations omitted).

The Smiths present the following claims for review:

> A. Whether the [t]rial [c]ourt erred when it allowed the introduction of the testimony and appraisal report of National Fuel's Appraiser to the jury.
>
> (i) Whether the jury improperly relied upon, and based their [sic] award of just compensation on, inadmissible evidence.
>
> B. Whether the [t]rial [c]ourt erred when it excluded the introduction of the Gillett Report; and Ordered all testimony and reports, expert or otherwise, that relate to damages including but not limited to pipeline explosions, burn areas, potential impact, blast zones, and perceived risks associated with proximity to natural gas pipelines were precluded, without supporting market data.
>
> (i) Whether the [t]rial [c]ourt[] erred when it determined its Order excluding the aforesaid evidence did not entirely preclude introduction of the testimony and reports of the Smiths' Appraisers.

Smiths' Brief at 4.

The Smiths' claims question the trial court's ruling on the admissibility of expert testimony. The admission or exclusion of evidence is within the sound discretion of the trial court, and we will not disturb a trial court's evidentiary rulings absent an abuse of discretion. *Lower Makefield Twp. v. Lands of Dalgewicz*, 4 A.3d

6

1114, 1117 (Pa. Cmwlth. 2010). "A trial court's ruling on the admissibility of an expert opinion will not be reversed on appeal absent clear error." *Milan v. Com., Dep't of Transp.*, 620 A.2d 721, 726 (Pa. Cmwlth. 1993) (citing *B.P. Oil Co. v. Del. Cty. Bd. of Assessment Appeals*, 539 A.2d 473, 476 (Pa. Cmwlth. 1988)).

## A. National Fuel's Appraiser's Testimony and Report

The Smiths claim that the trial court erred by allowing into evidence the testimony and an appraisal report of National Fuel's appraiser. *See* Smiths' Brief at 20-23. The Smiths argue that National Fuel's Hayden Appraisal failed to consider the fair market value of the Smiths' entire property before and after the Taking in that the report did not consider: interference with subterranean mineral rights and the diminution in value resulting from such interference; the reduction in value due to the "division" of the property; or the value of, and accommodations required by, the temporary construction easement. *Id.* The Smiths further argue that National Fuel's appraiser's failure to consider these items resulted in an improper and inadmissible expert report and that, as such, the jury based its just compensation award upon inadmissible evidence. *Id.*

National Fuel, on the other hand, argues the Hayden Appraisal conformed to the standards articulated by the Eminent Domain Code to determine damages resulting from a taking. *See* National Fuel's Brief at 12-19. National Fuel argues that: (1) the Eminent Domain Code does not require consideration of mineral rights in just compensation appraisals; (2) none of the appraisals considered the mineral lease; (3) the Smiths offered no evidence related to the lease at trial; and (4) the Hayden Appraisal expressly considered the impact of the easement location and the temporary construction easement. *Id.*

7

*1) Consideration of the Mineral Estate and the Impact of the Property's Existing Mineral Lease*

The Smiths first argue that National Fuel's appraiser failed to consider the impact the easements had on the value of the Smiths' mineral estate[7] and a lease thereon. *See* Smiths' Brief at 20-21. The Smiths rely on *Werner v. Department of Highways*, 247 A.2d 444 (Pa. 1968), *In re Condemnation Proceeding by S. Whitehall Township Authority*, 940 A.2d 624 (Pa. Cmwlth. 2008), and *Morgan Signs, Inc. v. Department of Transportation*, 723 A.2d 1096 (Pa. Cmwlth. 1999), for the proposition that a failure by an appraiser to consider mineral estate values, or leases concerning such estates, renders a compensation appraisal completely incompetent. We disagree.

Initially, the Eminent Domain Code defines "just compensation" as follows:

> Just compensation shall consist of the difference between the fair market value of the condemnee's entire property interest immediately before the condemnation and as unaffected by the condemnation and the fair market[8] value of the property interest remaining

---

[7] "Pennsylvania law recognizes three discrete estates in land: the surface estate, the mineral estate, and the right to subjacent (surface) support." *Consolidation Coal Co. v. White*, 875 A.2d 318, 326 (Pa. Super. 2005). These estates are severable, and so different owners may hold title to separate and distinct estates in the same land. *Id.*

[8] The Eminent Domain Code defines "fair market value" as follows:

> Fair market value shall be the price which would be agreed to by a willing and informed seller and buyer, taking into consideration but not limited to the following factors:

> (1) The present use of the property and its value for that use.

immediately after the condemnation and as affected by the condemnation.

26 Pa. C.S. § 702(a). Thus, to determine just compensation, the Eminent Domain Code requires an examination of a property's value both before and after a taking. *Id.* Further, our Supreme Court has pronounced the following basic principles of condemnation:

> First, the general rule is that the proper measure of damage for lands taken under the power of eminent domain is the difference between the market value of the land before the exercise of the power and as unaffected by it and the market value immediately after the appropriation and as affected by it. Second, it is permissible for the condemnee to introduce evidence of particular items lost through the condemnation. The condemnee may not, however, introduce evidence of the [v]alue of the particular items lost through condemnation but merely the fact that these items were lost. Third, as far as mineral deposits are concerned, the condemnee may not introduce evidence of the number of tons of minerals lost and then multiply that number by some dollar figure such as the market price or the royalty payment.

*Werner*, 247 A.2d at 446–47 (internal citations omitted).

---

(2) The highest and best reasonably available use of the property and its value for that use.

(3) The machinery, equipment and fixtures forming part of the real estate taken.

(4) Other factors as to which evidence may be offered as provided by Chapter 11 (relating to evidence).

26 Pa. C.S. § 703.

9

The Eminent Domain Code does not include a requirement that, to be valid, a property assessment must contain a valuation of a mineral estate. Further, the Smiths' cited case law does not advance their argument that without an assessment of a mineral estate, an appraisal is completely incompetent. *In re Condemnation Proceeding by South Whitehall Township Authority* concerned whether the condemnation of a 25-foot-wide utility easement amounted to a fee simple taking, but did not discuss any requirements relating to expert mineral estate valuations. *Morgan Signs* addressed the valuation of a lease for advertising sign boards on a condemned property. Neither case stands for the proposition that a failure to consider either the value of a property's mineral estate or a lease thereon renders an expert's property value assessment infirm.

Likewise, while it does concern a mineral estate, *Werner* does not stand for the proposition that a proper appraisal must contain a valuation of a mineral estate. In *Werner*, our Supreme Court held that a condemnee could introduce evidence of the existence of a certain tonnage of subsurface sand and gravel on condemned land, but could not offer a specific calculation of the value of those subsurface minerals as a deduction from the "before" value of the property for assessment purposes. *Id.* at 449. While the Supreme Court determined that mineral estate valuations *could* form part of just compensation appraisals, the Court did not make such valuations *mandatory*. *Id.* In fact, the Supreme Court noted that without accurate and current information regarding costs of mining minerals, bringing them to market, and market prices, knowledge of the quantity of minerals contained within a parcel of land does not help to value the land. *Id.* at 447 (citing *Searle v. Lackawanna & B.R. Co.*, 33 Pa. 57, 64 (1859)).

As a result, in practice, just compensation appraisals conducted by individuals lacking geology or engineering backgrounds often contain reservation language explaining that the appraisal does not include the value of a property's mineral estate. This occurred in National Fuel's Hayden Appraisal. However, while the Hayden Appraisal did not include a discussion of the property's underlying mineral estate, it did contain the following express limitation:

> 7. No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

Hayden Appraisal at 8; S.R.R. at 111b.[9] At trial, on cross-examination, National Fuel's appraiser, Gary Ciarimboli, explained that, while the mineral estate is included in fee simple ownership, it is not included in the appraisal due to lack of pertinent expertise. N.T. 1/10/2017 at 238-39; R.R. at 338a-39a. Mr. Ciarimboli explained that appraisals typically do not include mineral estates for that reason. *Id.* at 239; R.R. at 339a. In fact, the Smiths' appraisals also contained similar reservation language regarding the mineral estate in question. The Chiappetta Appraisal stated: "7) Subsurface rights such as minerals, oil and gas deposits were

---

[9] The Hayden Appraisal went on to further limit its findings as follows:

> 8. We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations, such as soils and seismic stability, and civil, mechanical, electrical, structural and other engineering and environmental matters.

Hayden Appraisal at 8; S.R.R. at 111b.

11

not considered in this report unless specifically noted to the contrary." Chiappetta Appraisal Addendum; S.R.R. at 502b. The Cestra Appraisal stated: "6. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for any such conditions or for arranging for engineering studies that may be required to discover them." Cestra Appraisal at 39; S.R.R. at 303b. With no legal requirement for the inclusion of a valuation of the mineral estate, and with proper notation of its exclusion, the trial court did not abuse its discretion by refusing to preclude the Hayden Appraisal or the testimony of Mr. Ciarimboli.

The lack of an examination of the property's mineral estate did not render the Hayden Appraisal incompetent. The Hayden Appraisal noted its lack of a mineral estate assessment and appropriately limited its findings regarding such estate. The Smiths had ample opportunity to challenge the Hayden Appraisal through cross-examination of Mr. Ciarimboli and/or by introducing their own evidence as to the mineral estate's value during their case.

The Smiths also argue that the Hayden Appraisal failed to consider the impact of the Taking on an existing mineral lease on the property.[10] *See* Smiths' Brief at 21-22. None of the appraisals discussed this lease, including the Smiths' appraisals. As the trial court noted:

> No one, neither the condemnor nor condemnees, offered the slightest suggestion that the value of the lease would be impacted in any way by a pipeline four feet below the

---

[10] In 2007, the Smiths encumbered the property with a lease that enabled Great Lakes Energy Partners, LLC, to drill and lay pipelines on the property. *See* N.T. 1/10/2017 at 101-03; R.R. at 201a-03a; *see also* Oil, Gas, and Coalbed Lease executed June 13, 2007 (Lease), R.R. at 48a-56a. The Lease defined the leased mineral estate as the "oil, gas, coalbed methane gas and liquid hydrocarbons" beneath the property. *See* Lease at 1; R.R. at 48a.

12

surface. It is perfectly obvious that the market value of the oil and gas estate was exactly the same, both before and after the [T]aking.

Trial Court Memorandum, dated July 7, 2017 (Trial Court Memorandum), at 3.

Additionally, the absence of testimony or evidence of the impact of the Taking on the existing mineral lease does not render the Hayden Appraisal inadmissible. As with the failure to discuss the mineral estate,[11] the Smiths could have addressed the issue during cross-examination of Mr. Ciarimboli or through their own expert testimony and/or reports, but elected not to do so.

*2) Consideration of the Easement Location and the Temporary Construction Easement*

Next, the Smiths argue the Hayden Appraisal failed to consider 1) the negative impact and reduced utility occasioned by the division of the Smith property into two parcels and 2) the effect of the temporary construction easement on the property. *See* Smiths' Brief at 22. These assertions are incorrect.

Contrary to the Smiths' suggestions, and as the trial court properly noted, the Hayden Appraisal and the testimony of Mr. Ciarimboli contemplated both the division of the property and the effect of the temporary construction easement. *See* Trial Court Memorandum at 3; N.T. 1/10/2017 at 223-24, 242-43; R.R. at 323a-24a, 342a-43a; Hayden Appraisal at 16; S.R.R. at 119b. Regarding the division of the property, Mr. Ciarimboli testified as follows:

---

[11] In addition to *Werner* and *Morgan Signs*, the Smiths cite *Captline v. County of Allegheny*, 727 A.2d 169 (Pa. Cmwlth. 1999), in an attempt to extend their argument that assessments that do not consider mineral estates are invalid to also require assessments to expressly consider leases that concern the mineral estates of such properties. *Captline* involved a claim for attorneys' fees and expenses in a just compensation/taking matter that hinged on whether a taking was a de jure or de facto condemnation, and does not advance the Smiths' argument.

Q. But more importantly, you say [in the Hayden Appraisal], the new easement divides the site in two parcels?

A. That's correct.

Q. What did you mean by that?

A. The easement severs the property into two sections. There's the main section where the house and the majority of the land is, then you have the easement and then you have the area, basically, slopes down to Interstate 70.

Q. Before the easement was there, what was the topography like where the easement is now?

A. Again, I didn't see it before the easement. I can go with what the topography map showed. It's, basically, the same as what the easement is now.

Q. Was it capable of having a building put on it?

A. Yes.

Q. Then you go on to say, the new easement restricts the overall utility of the site. What did you mean by that?

A. Well, again, before the easement, the property is a whole. After the easement, the property is not a whole because you have the easement that divides the property in two sections. So, again, you don't have that unity of use. But again, the area that the easement divided, that's what you can't, basically, use. You lose some rights of that easement area. You can't build on it. However, you can walk on it, you can ride a horse on it, you can ride a bicycle or whatever, I don't know about a bicycle, but you just can't build on that easement area.

14

N.T. 1/10/2017 at 242-43; R.R. at 342a-43a. Regarding the temporary construction easement, Mr. Ciarimboli testified as follows:

> Q: Now, we were talking about the temporary construction easement. Is that somehow in [the Hayden Appraisal]? Do you factor that into damages?
>
> A. Yes. That's included in the damages. Basically, a temporary construction easement, when somebody takes a temporary construction easement, they are, basically, renting the ground for a two-year period.
>
> So what we do in the appraisal world, we take the area, in this instance, it was .7372 acres, times the after value land value, which was $3,700 an acre, we give it a 10 percent return, which is a pretty good return, times 10 percent times 2 years. In this instance, the temporary construction easement number would be $546, and that's incorporated in my damage figure.

N.T. 1/10/2017 at 223-24; R.R. at 323a-24a. Accordingly, the record reflects that both the division of the property and the effect of the temporary construction easement were addressed, despite the Smiths' assertion to the contrary.

The Smiths are not entitled to relief on the denial of their motion in limine as the trial court did not abuse its discretion by refusing to preclude National Fuel's Appraisal or the testimony of their expert witness.

**B. *The Gillett Report and the Limitation of the Smiths' Appraisers' Testimony***

In their second claim, the Smiths argue that the trial court erred by partially granting National Fuel's motion in limine. *See* Smiths' Brief at 23-32. The Smiths argue that the trial court improperly excluded the Gillett Report and further improperly limited the testimony of their witnesses to preclude references to

15

perceived risks associated with proximity to natural gas pipelines (pipeline stigma) without supporting market data. *Id.* The Smiths argue that the trial court's limitation on their experts' testimony effectively precluded the experts from testifying, as the experts' reports and opinions all were based, to a certain degree, on the pipeline stigma notions and data. *Id.*

National Fuel argues that the trial court properly partially granted its motion in limine. *See* National Fuel's Brief at 19-40. National Fuel argues the Gillett Report was a compilation of pipeline explosion data completely unrelated to the subject pipeline and/or National Fuel's operations, and that the Smiths' appraisers ultimately improperly set the "after" value for the property based on the indefinite, speculative, and remote possibilities/information contained in the Gillett Report. *Id.* Further, National Fuel argues that the trial court merely limited, not completely precluded, the Smiths' experts from testifying. *Id.* at 35-40.

1) *The Gillett Report*

Our Supreme Court has long held that, in eminent domain takings cases, a landowner may expect just compensation based on "reasonable certainties inherent in the present, not for chances or future possibilities." *Gilleland v. New York State Nat. Gas Corp.*, 159 A.2d 673, 676 (Pa. 1960); *see also Wallace v. Jefferson Gas Co.*, 23 A. 416, 419 (Pa. 1892) (holding that testimony of merely speculative, imaginary, theoretical, and doubtful character, founded upon remote and uncertain possibilities, should be excluded).

The Gillett Report "provides a historical sample of the observed damage resulting from the explosions of natural gas transmission pipelines." Gillett Report at 2; S.R.R. at 516b. Specifically, the Gillett Report details a 2012 gas pipeline rupture and explosion in Sissonville, West Virginia. Gillett Report at 2-11;

16

S.R.R. at 516b-525b.  Thereafter, the Gillett Report discusses sample data from 19 separate rupture events that occurred throughout Canada and the United States over the course of 47 years, but never addresses how these events affected real estate markets in which they occurred.  Gillett Report at 12-28; S.R.R. at 526b-42b. National Fuel did not operate any of the pipelines involved in the explosions discussed in the Gillett Report.

While relevant in a theoretical sense, the Gillett Report represented chance or future possibilities as opposed to reasonable, present certainties. Accordingly, the trial court did not abuse its discretion in precluding admission of the Gillett Report from trial.

### 2) *Limitation of the Smiths' Appraisers' Testimony*

Our Supreme Court has held that, "[w]hile an expert's opinion may not be based upon pure conjecture, [] an appraisal expert's best efforts to quantify a reduction in property valuation as a result of a subjective and intangible stigma is permissible."  *Harley-Davidson Motor Co. v. Springettsbury Twp.*, 124 A.3d 270, 286 (Pa. 2015).  However, the Court cautioned, "while consideration of an environmental stigma may be examined when determining fair market value, expert testimony of such stigma may not be offered without any foundation."  *Id.*

Here, the Smiths' Appraisers reduced the property valuation based on the possibility of a catastrophic explosion caused by a future pipeline rupture.[12]  The Smiths' Appraisers did not base their stigma valuations on a foundation of market data indicating an actual fear in the community of a possible gas pipeline explosion.

---

[12] The Cestra Report provided for a 35% downward adjustment of the property's overall valuation based on the risk of a pipeline explosion.  *See* Cestra Report at 36-37; S.R.R. at 300b-01b.  The Chiappetta Report provided for a 20% downward adjustment in total value, which it described as "a subjective conclusion[.]"  Chiappetta Report at 22; S.R.R. at 427b.

17

Instead, the Smith Appraisers based their valuations on speculation of a remotely possible future cataclysmic event such as those discussed in the Gillett Report without offering any evidence or foundation of the market effect of the stigma in the area. *See* Cestra Report at 36; S.R.R. at 300b (discussing pipeline accidents nationwide as a valuation adjustment); Chiappetta Report at 22, 27-29; S.R.R. at 427b, 432b-34b. The trial court elaborated on its decision to preclude from appraiser testimony references to possible pipeline explosions without a foundation of market data as follows:

> There is no doubt that a buyer would rather not have a pipeline on his or her property if it could [b]e avoided. That is why property owners are awarded just compensation. When a pipeline comes through, the surface is disrupted and the owners must deal with dust, noise and mud. The value of the land taken is largely lost. After the pipeline is installed, the owners can expect to encounter from time to time strangers on their land as maintenance is performed. And every once in a while, in this huge nation, a pipeline blows up. The danger of a pipeline is just one of many factors associated with a diminution in value. If there is any place where the effect of that danger could be quantified, it would be in southwestern Pennsylvania[,] which is virtually cross-hatched with pipelines of all sizes and descriptions. If such a factor exists in any significant degree, it would be observable in market data, but none of [the appraisals] offered any evidence whatsoever that proximity to pipelines actually decreases property values.

Trial Court Memorandum at 3-4.

The Smiths appear to have drawn the conclusion that the trial court's second order limiting the expert testimony in fact completely precluded them from offering any testimony at trial relating to the risk of pipeline explosions or the effect

18

such a risk would have on an appraiser's property valuation, as well as any testimony from appraisers who had considered such risks in conducting their appraisals. *See* Smiths' Brief at 32. We disagree with this interpretation and further note that the Smiths did not request a continuance to obtain new experts or to amend existing expert reports in light of the trial court's order.

The trial court's order did not completely preclude testimony from the Smiths' appraisers Dennis Cestra or Francis Chiappetta and Paul Chiappetta, or prevent those appraisers from testifying that pipeline properties are less valuable than non-pipeline properties, partially due to a risk of explosion. *See* Second Order; R.R. at 99a. The order instead restricted the appraisers' possible testimony in terms of quantification of the reduction in market value based on a possibility of a pipeline explosion in the absence of market data. *Id.* Prior to the commencement of trial, the trial court explained the restriction as follows:

> I mean, I don't [m]ind somebody saying a pipeline property is less valuable than non-pipeline property, and one of those reasons is because there is a potential for explosion. What I don't want is somebody saying that's 30 percent or 20 percent, because no one knows that. I don't care what Gillett[] says.
>
> But it's a factor, so I think you can refer to that. I don't think you can quantify it. I don't think it can be quantified. I think it could, but nobody has done it. . . .
>
> So I'm not going to say he cannot mention the possibility of an explosion or a failure, but I don't want to hear any of that 30 percent. . . .
>
> I don't want [the appraiser] to mention any numbers. [The appraiser] has got no basis for any numbers, no legitimate basis for any numbers that I'm aware of. . . . [T]hat's the ruling.

19

N.T. 1/10/2017 at 12-14; R.R. at 112a-14a. The trial court further elaborated on the effect of its second order as follows:

> Our order *in limine* did not exclude the [Smiths'] experts' reports, only that portion of those reports that sought to introduce an arbitrary percentage deduction in value because of stigma. Those experts were permitted to offer their opinion of the amount of just compensation due the Smiths based on market data. For whatever reason, the [Smiths] elected to offer no evidence on just compensation except their own opinion. They cannot complain when the jury apparently accepted the testimony of the only professional appraiser they heard.

Trial Court Memorandum at 4.

We find no abuse of discretion in the trial court's preclusion of reference to remote possibilities of explosion without a foundation based on market data or other verifiable information, and we agree with the trial court that the order so limiting such testimony did not preclude the Smiths' Appraisers from testifying at trial. We further note that even if the Smiths believed that the trial court's ruling completely precluded their experts on the eve of trial, they made no request to continue the trial to obtain new experts or to have their expert reports conform to the ruling.

The trial court did not abuse its discretion in denying the Smiths' motion in limine because the Hayden Appraisal properly considered the fair market value of the Smiths' entire property before and after the Taking. Likewise, the trial court did not abuse its discretion in partially granting National Fuel's motion in limine to exclude the Gillett Report and limiting the testimony of witnesses to preclude references to perceived explosion risks associated with properties'

20

proximity to natural gas pipelines without supporting market data. Accordingly, we affirm the July 7, 2017 trial court order denying the Smiths' motion for a new trial and directing the Prothonotary to enter judgment in favor of National Fuel.

_____
CHRISTINE FIZZANO CANNON, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Condemnation of Permanent and      :
Temporary Rights of Way for the      :
Transportation of Natural Gas in      :
Buffalo Township, Washington County, :
Pennsylvania, Over Lands of      :
Dr. Larry G. and Mary P. Smith by      :
National Fuel Gas Supply Corporation      :
     :
     :
     :
Dr. Larry G. Smith and Mrs.      :
Mary P. Smith, husband and wife,      :
     :
        v.      :
     :
National Fuel Gas Supply Corporation      :
     :
Appeal of:      :     No. 1093 C.D. 2017
Larry G. Smith and Mary P. Smith      :


# O R D E R


AND NOW, this 13th day of June, 2018, the order of the Washington County Court of Common Pleas dated July 7, 2017 denying Appellants Larry G. Smith and Mary P. Smith's motion for a new trial and directing the Prothonotary to enter judgment in favor of National Fuel Gas Supply Corporation is AFFIRMED.


_____
CHRISTINE FIZZANO CANNON, Judge